IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
GREENSBORO DIVISION

---

JENNIFER OLDHAM,

<div style="text-align:center">Plaintiff,</div>

vs.

THE PENNSYLVANIA STATE
UNIVERSITY; CHRISTOPHER J. HARRIS,
as agent for Penn State in his official capacity;
WIESLAW R. GLON, as agent for Penn State
in his official capacity and in his individual
capacity; and GEORGE G. ABASHIDZE, as
agent for Penn State in his official capacity
and in his individual capacity,

<div style="text-align:center">Defendants.</div>

**FILE NO. _____**


COMPLAINT AND
DEMAND FOR JURY TRIAL

---

## **COMPLAINT**

Plaintiff Jennifer Oldham, by and through her attorneys, respectfully alleges as follows:

### **I.**

### **FACTS RELEVANT TO ALL COUNTS**

1.    On December 12, 2017, on a domestic flight somewhere over the Great Plains region of the United States, Defendant George Abashidze thrust his hand between Jennifer Oldham's legs and grabbed her genitalia without her consent.

2.    Abashidze made numerous lewd comments, touched Oldham's legs, arms and face without her consent, and repeatedly demanded that Oldham have sex with him during the

four-hour flight, all unwelcomed conduct by Oldham and within earshot of nearby passengers.

3.     At the time Abashidze was employed as an Assistant Coach and traveling as a representative of the Defendant Pennsylvania State University's ("Penn State" or "the University") men's and women's fencing team. Abashidze was, upon information and belief, directly supervised in his employment by Defendant Wieslaw Glon, the fencing team's Head Coach.

4.     Upon information and belief, both Abashidze and Glon were on notice from Penn State that all coaches were classified as "responsible employees" and, as such, each of them was required to have a working knowledge of and participate in training related to the University's sexual misconduct policy, including a responsible employee's duty to report any incident of possible sexual misconduct to Penn State's Title IX Coordinator.

5.     Upon information and belief, Penn State had enhanced its sexual misconduct prevention and response training requirements for its Athletic Department coaches and staff after egregious shortcomings in the University's awareness of and institutional interest in preventing sexual misconduct in the Athletic Department were exposed when the Jerry Sandusky serial child molestation tragedy was uncovered in 2011.

6.     At the time Abashidze committed the assaults and batteries on Oldham, they were on a flight from Portland, Oregon to Chicago O'Hare Airport where each had a connecting flight to another city.

7.      Abashidze was returning from coaching Penn State fencing team members at a USA Fencing[1] North American Cup tournament.

8.      Oldham had also attended the North American Cup tournament as the coach for a fencer from her private club in Durham, North Carolina.

9.      On the flight, Abashidze was in an aisle seat with Oldham on his right in her center seat and another passenger, also returning from the fencing event, in the window seat of a three-seat row.

10.     Although they were not traveling together, Oldham was generally acquainted with both Abashidze and the passenger on her right prior to the flight.

## II. THE PARTIES

11.     Plaintiff Jennifer Oldham is the owner and Head Coach of Mid-South Fencers' Club, a private fencing club and training facility located in Durham, North Carolina. Oldham is a resident of Durham County, North Carolina, a University of North Carolina at Chapel Hill graduate, and a native North Carolinian.

---

[1] USA Fencing is the official National Governing Body or NGB of the sport of fencing and is authorized by the United Stated Olympic Committee. https://www.usafencing.org/ (last retrieved 22 May 2020).

12.     Defendant Pennsylvania State University[2] ("Penn State" or "the University") is a state-related, land-grant, research university, is independently governed[3], and is associated with Pennsylvania's Commonwealth System of Higher Education. The University conducts and profits from several streams of business in North Carolina.

13.     Defendant Christopher Harris was, at all relevant times herein, Penn State's Title IX Coordinator and responsible for receiving all reports of sexual misconduct at the University. Harris, upon information and belief, began working in the position of Title IX Coordinator in July 2018, after working in student affairs administration for 15 years and is a resident of Centre County, Pennsylvania.

14.     Defendant Wieslaw Glon is the Head Coach of Penn State's fencing team and, upon information and belief, has been coaching at Penn State since 1985 and is a resident of Centre County, Pennsylvania.

15.     Defendant George Abashidze was at all relevant times herein, an Assistant Coach of Penn State's fencing team and, upon information and belief, had been coaching at Penn State for ten years and is a resident of Centre County, Pennsylvania.

---

[2] Penn State has 24 physical campuses as well as online certification and degree programs. Unless otherwise noted, "Penn State" herein refers to the University Park campus in Centre County, Pennsylvania.

[3] Penn State is independently or self-governed unlike, for example, the University of North Carolina System, which is state-governed.

## JURISDICTION AND VENUE

16.    Oldham brings this action to seek redress for sexual harassment and discrimination based on gender and sex by the defendants pursuant to Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a).

17.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, which gives district courts original jurisdiction over all civil actions arising under the Constitution, laws, and treaties of the United States.

18.    This action is also instituted under this Court's pendent jurisdiction to hear state claims related to those matters for which there is a federal claim basis. These state claims are based in North Carolina law and include battery, failure to train and supervise, negligence, gross negligence, and negligent and/or intentional infliction of emotional distress, and civil conspiracy to commit an unlawful act.

19.    Upon information and belief, Defendant Penn State is a legal entity organized and operating primarily in the Commonwealth of Pennsylvania. Penn State conducts business in North Carolina in such a manner as to be sufficient to meet the minimum contacts threshold for this Court to exercise personal jurisdiction over the University in that, upon further information and belief, it has come to or reached into North Carolina in order to:

     a.    Initiate multiple phone calls from Pennsylvania to Oldham in Durham,

     b.    Send correspondence, electronic calendar invitations and web links through email from Penn State to Oldham in Durham,

    c.  Be approved to operate in North Carolina by the University of North Carolina Board of Governors under the State Authorization Reciprocity Act (SARA) since 2017,

    d.  Recruit and offer scholarships to North Carolina academics, students and athletes,

    e.  Travel to North Carolina for the signing of NCAA letters of intent and athletic scholarship contracts,

    f.  Market, sell and provide more than 150 graduate and undergraduate online certificate and degree programs[4] to North Carolina residents,

    g.  Participate in athletic competitions, including fencing tournaments, at locations in Wake County, Orange County, Durham County and Forsyth County, for which it receives monetary benefits and increased institutional visibility that enhances its reputation in North Carolina,

    h.  Offer Penn State trademark-branded affinity license plates to North Carolina residents through an arrangement with the North Carolina Division of Motor Vehicles,

---

[4] Penn State's online program is known as the "Penn State World Campus" and, upon information and belief, serves almost 15,000 students from all 50 states and more than 60 countries. https://www.worldcampus.psu.edu/ (last retrieved 22 May 2020)

i.  Sponsor, support, fund, staff, oversee and coordinate the work of the Penn State Alumni Association which has four chapters in North Carolina, including one in Greensboro, organized and maintained to maximize the breadth and depth of Penn State's financial development programs in North Carolina and enhance its reputation in the state, and

j.  Participate in on-line ad tracking programs to target particular North Carolina residents who have shown an interest in Penn State or Penn State athletics in order to expose them to paid advertising, information and/or links to its programs, and to enhance the University's visibility, reputation and profits in North Carolina.

20.    Defendants Harris, Glon and Abashidze are each, upon information and belief, residents of Pennsylvania.

21.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) in that a substantial part of the events, acts or omissions giving rise to Oldham's action occurred in this district, and/or more so in this district than in any other single district.

22.    Oldham and her witnesses reside in or around Durham County, North Carolina, or reside in states other than Pennsylvania.

### III. APPLICABLE LAW AND POLICY

23.    Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681(a), states:

> No person in the United States shall, on the basis of sex, be
> excluded from participation in, be denied the benefit of, or be
> subjected to discrimination under any education program or
> activity receiving Federal financial assistance. …

24.    Title IX is implemented through the Code of Federal Regulations. See 34 C.F.R. Part 106.

25.    In *Gebser v. Lago Vista Independent School District*, 524 U.S. 274 (1988), the United States Supreme Court recognized that a recipient of federal educational funds intentionally violates Title IX, and is subject to a private damages action, where the recipient is "deliberately indifferent" to known acts of teacher-student discrimination.

26.    In *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999), the United States Supreme Court extended the private damages action recognized in *Gebser* to cases where the harasser is a student, rather than a teacher.

27.    *Davis* held that a plaintiff may prevail in a private Title IX damages action against a school in cases of student-on-student harassment where the funding recipient is:

   a)  deliberately indifferent to sexual harassment of which the recipient has actual knowledge, and

   b)  the harassment is so severe, pervasive and objectively offensive that it can be said to deprive the victim of access to the educational opportunities or benefits provided by the school.

*Davis*, 526 U.S. at 1669–76.

28.    Penn State established an employee travel policy titled "*TR02 Penn State Travel Policy*" ("TR02") for university employees "traveling on behalf of the university." TR02 had an effective date of January 5, 2017 and was in effect at all relevant times herein.

29.    TR02 states Penn State's business travel policies for employees including the language: "Those who travel on behalf of the University hold a position of trust and responsibility. They work independently, represent the University to the outside community, and are authorized to spend University funds for travel."

30.    Penn State adopted an administrative policy addressing discriminatory acts prohibited pursuant to Title IX titled "*AD85 Sexual and/or Gender-Based Misconduct and Harassment*". AD85 had an effective date of January 27, 2014 and was in effect at all relevant times alleged herein.

31.    AD85 states Penn State's official policy on sexual misconduct and harassment policy and, among other things, contextualizes prohibited conduct.

> Sexual harassment committed by an employee … can lead to discipline … when: … 3. Such conduct is sufficiently severe or pervasive so as to substantially interfere with the harassed individual's employment, education or access to University programs, activities and opportunities, or creates a hostile or offensive environment for that individual or others.

32.    AD85 defines "Responsible Employee" as "[a]ll Penn State employees who are not Confidential Employees. Responsible Employees are required to report incidents of possible Prohibited Conduct to the Title IX Coordinator …"

33.    AD85 allows for complaints by those outside of Penn State stating "External Complaints: The University encourages all individuals with a pertinent complaint to follow the process in this Policy."

34.    Penn State establishes in AD85 that "[o]nce the University receives clear notice, prompt and equitable corrective measures will be taken to stop sexual or gender-based harassment or misconduct, to prevent its recurrence, and to remedy its effects."

35.    Penn State's sexual misconduct procedures address matters of sexual harassment and retaliation in relation to allegations of sexual misconduct. The procedures define retaliation as "[a]cts or words taken against an individual because of the individual's participation in a protected activity. ... Protected activity includes an individual's good faith 'participation in the reporting, investigation, or resolution of an alleged violation of this Policy' ... ." The procedures further provide that retaliation "may be committed by the Responding Party, the Reporting Party, or any other individual or group of individuals."

## COACH GLON'S COVER-UP

36.    Traumatized by Abashidze's sexual assault, Oldham shared the details of the event with her husband, Jeff Kallio, upon arriving home in North Carolina.

37.    Oldham also sought advice about how to deal with the assault from her professional mentor and former fencing coach, Ed Korfanty, a long-time friend of Glon's.

38.     Upon information and belief, on January 15, 2018, Korfanty then called Glon to speak with him about Oldham's assault.

39.     Upon information and belief, Glon then spoke with Abashidze about his conversation with Korfanty.

40.     Upon information and belief, Glon in his official capacity as agent for Penn State and Abashidze in his individual capacity conspired together to decide Glon would not share information about Abashidze's misconduct with Penn State's Title IX Coordinator or anyone else in the Penn State Athletic Department hierarchy.

41.     In February 2018, Glon and Abashidze travelled to Durham, North Carolina with the Penn State fencing team for a tournament at Duke University.

42.     Glon and Oldham arranged to meet while Glon was in Durham.

43.     Oldham detailed for Glon the sexual assault that happened on the plane at the meeting in Durham and gave him a copy of a written summary of the assault that she had created as a way to deal with the trauma and watched as he read it. Oldham felt that she had made an official report of the assault to Penn State by telling Glon about it.

44.     Oldham asked Glon at the meeting if he was going to report Abashidze's assault to the Athletic Department at Penn State.

45.     Glon said "no."

46.     Glon attempted to manipulate and/or intimidate Oldham by using his stature in the sport and at Penn State to convince her not to report the incident to the United States

Olympic Committee's SafeSport[5] program by informing her that it would be embarrassing for her if the assault became known and no one would believe her if she claimed Abashidze had sexually assaulted her.

47.    Upon information and belief, Glon was aware that Penn State could learn of an investigation at SafeSport and that it would jeopardize Abashidze's employment at Penn State.

48.    Glon then brought Abashidze into the conversation with Oldham and directed him to apologize to her, after which the Durham meeting ended.

49.    Upon information and belief, the individual who was sitting on Oldham's right in the plane and who witnessed some of Abashidze's conduct had submitted a report about the incident to SafeSport.

50.    Following Oldham's February 2018 discussion with Glon, Oldham was advised by others to report the sexual assault to the SafeSport program but was hesitant to do so out of fear for her career and other reputational consequences that Glon had mentioned.

51.    Oldham was told by one professional colleague "If you don't report it, I will."

---

[5] The United States Center for SafeSport is an independent organization focused on ending all forms of abuse in sport. The Center is federally authorized under the *Protecting Young victims from Sexual Abuse and Safe Sport Authorization Act of 2017* (Public Law No: 115-126, 2/14/2018). SafeSport develops resources and policies to safeguard athletes and is the exclusive authority to respond to sexual misconduct within the US Olympic Committee and each sport's National Governing Body.

52.     In April 2018, Oldham attended a USA Fencing North American Cup tournament in Richmond, Virginia. She was approached by Korfanty who asked if she would speak with him and Glon over coffee.

53.     During their conversation, Glon seemed intent on pressuring Oldham not to engage with SafeSport and, if she was questioned by them, to refute the allegations filed by the third-party witness.

54.     Glon again told Oldham that she would not be believed if the story was uncovered or made public, that SafeSport would take no action against Abashidze, and that she shouldn't bother speaking with SafeSport.

55.     Glon then tried to impress upon Oldham what a "good guy" Abashidze was and how the growing fallout from the assault was causing him anxiety, stress and a loss of sleep. Oldham believed that Glon thought Abashidze had become a victim.

56.     Oldham suggested to Glon that he had a duty to report the incident to Penn State.

57.     Glon told Oldham that he did not believe Abashidze was a "danger" to the team and that Glon was "watching him closely."

58.     The SafeSport program investigated the allegations against Abashidze, found him to be responsible for the assault and publicly suspended Abashidze from involvement with USA Fencing[6] sanctioned events in 2018.

---

[6] USA Fencing is the authorized National Governing Body for the sport of fencing in the United States. https://www.usafencing.org/ last retrieved May 26, 2020.

59.    Abashidze appealed the suspension and a hearing was held at which witnesses were called and testimony was given by Abashidze, Glon, Oldham and others.

60.    SafeSport again found Abashidze responsible for the assault and harassment of Oldham and publicly suspended Abashidze from any involvement with USA Fencing for a year.[7]

## PENN STATE'S HISTORY OF COVER-UP

61.    In November 2011, Jerry Sandusky, a former Assistant Coach for Penn State's football team, who had worked under Head Coach Joe Paterno, was indicted on 52 felony counts for child sexual abuse that occurred between 1994 and 2009.

62.    The 2011 grand jury investigation into the Sandusky allegations had revealed that Sandusky's criminal behavior was known to Penn State as early as 1998. In 2002, one of Sandusky's assaults was witnessed by a Penn State football staff employee who then reported the conduct to members of the athletic department, including Head Coach Paterno. However, members of the athletic department decided to keep the information secret and failed to act to prevent further abuse.

63.    Head Coach Paterno was fired in 2011 before the completion of his 46th season at Penn State.

---

[7] SafeSport's public disciplinary database now reflects Abashidze as "permanently ineligible" (pending appeal) as of May 13, 2020. https://uscenterforsafesport.org/response-and-resolution/disciplinary-database/ last retrieved May 25, 2020.

64.    Louis Freeh, a former Director of the FBI, was retained by Penn State's Board of Trustees to conduct an internal investigation into the Sandusky affair. The 2012 Freeh Report recited that high-ranking Penn State officials had been aware of Sandusky's criminal behavior since approximately 1998, had failed to take any meaningful, appropriate action, and had essentially empowered Sandusky to be able to continue his pattern of sexual abuse and misconduct.

65.    Sandusky was convicted of 45 counts and was sentenced to 30 to 60 years in prison.

66.    Former Athletic Director Timothy Curley, together with former Penn State Vice President Gary Schultz, and former Penn State President Graham Spanier, were criminally charged in the cover-up. Those charges included failure to report child abuse, obstruction of justice and perjury.

67.    Upon information and belief, the impact of Sandusky's criminal conduct and the acts of willful blindness and/or cover up of that behavior by others at Penn State had profound consequences for the University. In addition to the university officials criminally charged, others were forced to resign, civil lawsuits were filed, and the NCAA imposed sanctions that included a $60 million fine, a four-year post-season competition ban, athletic scholarship reductions, and retroactive forfeitures of football program wins.

68.    Mark Emmert, then NCAA President, explained that the extraordinary sanctions imposed were "not to be just punitive, but to make sure the university establishes an athletic culture and daily mindset in which ... [athletics] will never again be placed ahead of educating, nurturing, and protecting young people."

69.     Upon information and belief, in May 2019, a reporter from the Philadelphia Inquirer asked present Penn State President Eric Barron about the Oldham allegations and Barron told the reporter he would "be surprised" if a coach new of an issue like Oldham's and did not report it.

## OLDHAM'S EFFORTS TO UNCOVER THE COVER-UP & SEEK REDRESS

70.     In July of 2018, Oldham's husband Jeff Kallio, concerned for Oldham's well-being, hoping to help her achieve some closure, and without Oldham's knowledge, contacted Penn's State's Athletic Director Sandy Barbour by email about his wife's assault.

71.     Harris and Penn State Athletics Integrity Officer Robert Boland then contacted Kallio by email and phone to discuss the situation in more detail.

72.     Boland and Harris told Kallio that his report of Oldham's allegations against Abashidze and Glon that day was the first they had heard of the situation.

73.     Harris and others initiated a conference call phone interview with Oldham on August 14, 2018, during which she told Harris and Penn State details about Abashidze's assault and Glon's failure to report the assault, and she asked Harris to investigate.

74.     Upon information and belief, Harris began an Affirmative Action Office ("AAO") investigation into Abashidze's assault.

75.     Oldham heard nothing more from Harris between August 2018 and February 2019.

76.     During that six-month period, the SafeSport process was on-going and Oldham continued to endure harassment and retaliation through electronic media and in person at international competitions, which was, upon information and belief, perpetrated by

Abashidze's friends and supporters in the fencing community and those who were doubters of the burgeoning international #metoo movement.

77.     Upon information and belief, Abashidze and Glon were aware of and took no steps to stop the harassment and acts of retaliation against Oldham in 2018.

78.     It was only when Oldham contacted Penn State in February 2019 to find out what had happened with her claim that she got an update of sorts when she was told the investigation was "ongoing."

79.     Shortly thereafter, in February 2019, Harris emailed Oldham the initial AAO Determination in which he had substantiated and admitted as true her factual allegations of the assault and harassment by Abashidze.

80.     Despite the substantiation, Harris' AAO Determination then concluded that Abashidze's public groping of Oldham's genitalia and his other acts of unwanted touching and verbal sexual harassment inexplicably had _not_ violated any Penn State policy.

81.     In fact, Harris did not explain in the Initial Determination report how the conduct complained of was not conduct prohibited by AD85.

82.     The AAO Determination did not mention Glon's failure to report Abashidze's assault.

83.     Although she tried several times to arrange a personal meeting with Harris, Oldham was overtly and repeatedly discouraged from traveling to Penn State to meet with him in person to discuss her response to the Determination, a meeting that was expressly permitted by the Policy and Procedures.

84.    Oldham communicated her thoughts and many disagreements with the Determination in a brief phone conversation with Harris and others. She told them that she believed she could have better conveyed those factual inconsistencies along with the depth of her disappointment and dismay in person.

85.    Harris's AAO Final Determination reached the same conclusions about Abashidze's assaultive behavior and the University policies which he believed were, upon information and belief, wholly unable to protect people from sexual assaults committed by employees representing Penn State.

86.    There was no opportunity for Oldham to review and provide comment or corrections on Harris' AAO Final Determination as was expressly permitted by the Title IX policy.

87.    There was no mention in Harris' AAO Determination of Glon's failure to report Oldham's claim.

88.    The Final Determination deferred reaching an AAO or Title IX-based final conclusion until after a future and separate investigation and determination could be made by Boland's parallel Inter Collegiate Athletics ("ICA") investigation that Oldham was told would apply policies and procedures in the Penn State Athletic Code and rules promulgated by the NCAA .

89.    Upon information and belief, there was no policy or procedure that supported a deferral of an outcome notice or that contemplated a parallel investigation of Title-IX related conduct outside of the Title IX office.

90.    Oldham was not asked to be involved in or given an opportunity to review or comment on an ICA report. She was never given notice of the ICA investigation's outcome or its impact on the AAO outcome.

91.    Oldham called Penn State again to ask about the ICA outcome on Abashidze and Harris told her the process was complete and he could not share any further information with her.

92.    Harris then obliquely suggested that Oldham might be able to "figure out" what happened with Abashidze by looking at the University's website.

93.    In April 2019, not understanding why Glon's failure to report Abashidze's assault was not being investigated, Oldham submitted to Harris a written Title IX complaint alleging that Glon had sexually harassed and discriminated against her based on sex and gender, when he

  a.  Attempted to intimidate and manipulate her to keep her from reporting the assault to Penn State or SafeSport;

  b.  Told her no one would believe her if she said Abashidze assaulted her;

  c.  Suggested she would be embarrassed and her reputation would suffer if she made a report;

  d.  Implied that everyone in their predominantly male sport would conclude she was lying about the assault;

    e. Told her he was not going to report her claim of sexual assault to anyone in Penn State's Athletic Department;

    f. Stated that she didn't know how to take a joke; and

    g. Obstructed Penn State's timely and appropriate institutional response to her sexual assault complaint.

94.    Penn State never responded to Oldham's report about Glon. There was no opportunity for her to be interviewed, see a report, review evidence, participate in a hearing, elect to appeal the outcome, or question the process.

95.    Oldham was not told the final outcome of either the Abashidze or Glon complaint and did not become aware that Penn State was required to disclose those outcomes to her until March 2020, when a United States Department of Education Office of Civil Rights ("OCR") compliance review of sexual misconduct cases at Penn State spanning the years 2011 to 2020 was published, revealing that OCR:

    a. Found that the manner in which Penn State responded to sexual misconduct claims has been under constant official review since 2011 by one entity or another, each of which generated detailed findings or reports. In addition to OCR's independent review, the reviewing entities included the Pennsylvania Attorney General's Office, the Pennsylvania General Auditor's Office, and Freeh's independent investigation team;

b.  Reviewed over 300 sexual misconduct cases at eight Penn State campuses spanning ten years;

c.  Summarized only ten of those 300 matters in its 2020 letter of findings (without identifying any parties), including a summary that combined Oldham's Title IX complaints against Abashidze and Glon, as well as her interactions with Penn State. OCR referred to Oldham's situation and Penn State's improper handling of her claims in both the letter of findings and the resolution agreement entered into with Penn State;

d.  Determined that the University had failed to respond promptly and equitably to complaints of sexual harassment, including complaints initially reported to the Athletic Department in 2017-18, one of which was Oldham's complaint about Abashidze;

e.  Was told by the University that the Athletic Integrity Officer always referred all claims against employees that had Title IX implications to the Title IX Coordinator for handling by the Title IX Coordinator and an Associate Vice President and had been doing so ever since the creation of the AIO position in 2013.

f.  Determined that the University did not follow its own policies and procedures when there was a delay in notifying the Title IX

Coordinator of sexual harassment allegations initially reported to the Athletic Department.

g.  Determined that the University's Title IX procedures did not sufficiently provide for notice of the outcome of a complaint to the parties.

96.    OCR issued a letter of findings and entered into a resolution agreement with Penn State on March 27, 2020 in an attempt to bring Penn State's sexual misconduct policies and procedures into compliance with Title IX.

97.    Due to the failures of Penn State's Title IX process and an unwillingness of Glon and Penn State's administration to respond to Oldham complaints in a timely and meaningful way, Oldham has:

a.  Suffered and continues to suffer severe mental distress and emotional injuries;

b.  Been subjected to a hostile environment in Penn State programs and activities, to wit, fencing events at which Penn State athletes and/or coaches and/or Abashidze's supporters participate;

c.  Scaled back her attendance at most national-level tournaments in the United States, as well as workshops and collegiate recruitment events out of fear of encountering Abashidze or Glon to the detriment of her business and family;

d.  Been abruptly dis-invited along with several of her club's members from an elite camp at Glon's friend Korfanty's club in Oregon after Korfanty had suffered a negative response for making a public statement when asked about Oldham's claim of assault that "maybe she provoke[d] him";

e.  Been falsely accused of causing a coach to lose a job opportunity when questions were raised by the potential employer about the coach's personal history;

f.  Been interviewed by an FBI agent with questions about the in-flight sexual assault by Abashidze, without knowing who contacted the FBI or how they became involved.

98.  The defendants' collective actions have effectively excluded Oldham from participation in, denied her the benefits of, and subjected her to discrimination in Penn State programs and activities that she had previously enjoyed.

99.  This action alleges violations of Title IX and the denial of Oldham's right thereunder.

## COUNT I

## VIOLATION OF TITLE IX and CIVIL CONSPIRACY (20 U.S.C. § 1681, et seq.)

## (Deliberate Indifference)

(v. All Defendants)

100.   All Paragraphs of this pleading are incorporated herein by reference.

101.   Title IX prohibits discrimination on the basis of sex in a school's educational program or activities, which include all of the school's operations. 20 U.S.C. §§ 1681(a), 1687.

102.   Upon information and belief, Penn State receives federal grant funding and/or has students who receive federal student financial aid, and thereby is a recipient of federal funds and must comply with Title IX.

103.   A victim of discrimination based on her gender has, under Title IX, a private right of action against the offending school for monetary damages and equitable relief.

104.   As set forth above and upon information and belief, Penn State had actual notice of the tortious sexual harassment and assault when Glon, a "responsible employee," first learned of it from Korfanty in January 2018.

105.   Oldham's claim of sexual assault and harassment against Abashidze, a tortious encounter of which Penn State had actual knowledge via Glon, and to which it could have responded to in January 2018, subjected Oldham instead to further tortious acts of sexual harassment and discrimination based on gender and sex by Glon in Durham in February 2018 and in Richmond, Virginia in April 2018, as more fully set forth herein.

106.   Upon information and belief, Abashidze (in his individual capacity) and Glon (in his official capacity) engaged in an ongoing conspiracy together starting in January 2018, when Glon first told Abashidze about Korfanty's call, through December 2018 when Glon and Abashidze both testified that Oldham was a liar at the SafeSport hearing, in order to

keep Oldham from reporting the assault and later to foster a general belief that she was not credible and should not be believed, in order to delay potential consequences for Abashidze.

107.    The deliberate indifference and unlawful discrimination by the combined acts of the defendants was in violation of Title IX, and proximately caused Oldham to sustain substantial injury, damage, and loss, including but not limited to: mental anguish, severe emotional distress, injury to reputation, injury to her livelihood, past and future economic loss, and loss of future employment prospects.

<div align="center">

**COUNT II**

**VIOLATION OF TITLE IX and CIVIL CONSPIRACY (20 U.S.C. § 1681, et seq.)**

**(Erroneous Outcome/Abashidze)**

(v. All Defendants)

</div>

108.    All Paragraphs of this complaint are incorporated herein by reference.

109.    As set forth above, Abashidze, Glon, Harris and the University engaged in a series of actions and inactions that concluded with Harris' Final Determination in April 2019 stating that Abashidze had sexually assaulted and harassed Oldham when he groped her genitalia but had not violated any university policy by doing so.

110.    Upon information and belief, Harris and Boland agreed to defer and/or cover up the AAO outcome until after the secret ICA outcome was determined.

111.    Upon information and belief, there was no policy provision that allowed this type of "lateral pass" of an investigation in the Title IX process and it was contrary to Penn State's practice and policy that made ICA subordinate to AAO in Title IX-related incidents.

112.    Upon information and belief, Harris conspired with Boland, Glon and with Abashidze in his individual capacity to take advantage of ambiguities in competing and inconsistent Penn State sexual misconduct policies in order to keep information about the Abashidze outcome from Oldham, contrary to AD85 and federal Title IX guidance.

113.    Upon information and belief, Glon in his official capacity as agent for Penn State and Abashidze in his individual capacity conspired to keep knowledge of the Safesport investigation secret from the University until the moment Abashidze was suspended from USA Fencing and his violation of USA Fencing and SafeSport policy became a public record.

114.    Upon further information and belief, Abashidze's public suspension from USA Fencing for sexual misconduct made him ineligible to work as a coach at Penn State.

115.    Upon information and belief, despite having actual knowledge of the assault via Glon in January 2018, Penn State did not alter Abashidze's employment status until his suspension by USA Fencing became public record and he lost the privilege of participating in elite, collegiate and Olympic level fencing activities associated with USA Fencing.

116.    Upon information and belief, the above instances of deceit and chicanery were perpetrated by the defendants as part of a conspiracy intended to preserve the reputations

and resources of each and all of the Defendants at the expense of Oldham's rights as a complainant and victim under Title IX.

117. OCR's acknowledgement in its March 2020 letter that the University's Title IX procedures did not sufficiently provide for notice to parties of the outcome of a complaint supports the contention that Harris's "no policy violation" determination and failure to provide Oldham notice of a final outcome in the Abashidze matter was an erroneous outcome.

118. Harris wrote in the initial AAO Determination Report that Oldham's ability to participate in Penn State's educational programs or activities was not diminished by Abashidze's sexual assault. Oldham disputed that contention during the investigation and again in her response to the initial AAO Determination. The AAO Final Determination was unchanged on that issue.

119. Harris did not acknowledge Oldham's express statements that her ability to participate as a coach, referee, spectator or athlete, or to have her club's athletes participate in any tournament, trip, camp or other event that Penn State's championship fencing team or internationally renowned coaches attend – all Penn State "activities" under Title IX – was dramatically impaired due to the hostile environment created by Abashidze's and Glon's conduct and her ongoing fear of a repeated occurrence or retaliation when encountering Abashidze, Glon and Abashidze's friends and supporters.

120. Harris did not acknowledge that Oldham's ability to position her college scholarship eligible athletes to visit Penn state or to be recruited by Penn State, perennially an NCAA

powerhouse and championship contender, was substantially impaired by the hostile environment created by the defendants. Athlete recruitment through athlete campus visits, coach home visits and scouting at athletic events are all Penn State activities in which an athlete's coach is expected to participate.

121.    Upon information and belief, Abashidze in his individual capacity and one or more of the other defendants conspired to have Harris produce a Final AAO Determination that deferred a conclusive outcome to a future date – a future date that never arrived.

122.    Based on Penn State's own policies and federal Title IX guidelines, Harris's conclusion that no Penn State policies were violated by Abashidze was clearly in error.

123.    This unlawful discrimination by the defendants in violation of Oldham's rights under Title IX proximately caused Oldham to sustain substantial injury, damage and loss, including but not limited to: mental anguish; severe emotional distress; injury to reputation; past and future economic loss; and loss of future employment prospects.

## COUNT III

## VIOLATION OF TITLE IX and CIVIL CONSPIRACY (20 U.S.C. § 1681, et seq.)

## (Erroneous Outcome/Glon)

### (v. Glon, Harris and Penn State)

124.    All paragraphs of this pleading are incorporated herein by reference.

125.    Upon information and belief, the investigation into Glon's failure to report included a conversation or an interview by Harris with Glon in his individual capacity, in which

Glon's personal interest in preserving his employment status was primary to his obligation to serve the University's interest.

126.    OCR acknowledged in its March 2020 letter that the University's Title IX procedures did not sufficiently provide for notice of the outcome in its reference to Oldham's complaints.

127.    Defendants failure to communicate any information to Oldham related to its investigation into her Title IX complaint about Glon could reasonably lead to an inference that the information, if communicated, would not have been received favorably by her.

128.    The absence of a notice of outcome where such notice is mandated can in itself be erroneous, regardless of the substance of the outcome.

129.    The conspiracy by the defendants to commit this unlawful act of discrimination proximately caused Oldham to sustain substantial injury, damage and loss, including but not limited to mental anguish; severe emotional distress; injury to reputation; past and future economic loss; and loss of future employment prospects.

## COUNT IV

### FAILURE TO TRAIN AND/OR SUPERVISE

### AGENTS AND/OR EMPLOYEES ON SEXUAL MISCONDUCT CLAIMS

(v. Penn State, Harris and Glon)

130.    All Paragraphs of this pleading are incorporated herein by reference.

131.    Upon information and belief, Glon and Harris were acting within the course and scope of their respective employment at all relevant times.

132.    Upon information and belief, Penn State has a policy that requires it to establish procedures to train and supervise its employees so they comply with to its policies related to public safety and sexual misconduct, thereby creating Penn State's duty to conduct such training and supervision with reasonable skill and care.

133.    Upon information and belief, it is Penn State's policy that all Athletic Department employees are required to receive annual training on their responsibilities and duties under AD85 and Title IX.

134.    Upon information and belief, Glon and/or Harris neglected their duty and failed to provide adequate annual sexual misconduct policy and Title IX training to all members of the Fencing Team's coaching staff.

135.    Upon information and belief, Glon and/or Harris neglected their duty and failed to ensure that all members of the Fencing Team's coaching staff were able and willing to comply with the spirit and letter of the University's policies and Title IX.

136.    Upon information and belief, Glon and/or Harris neglected their duty and failed to ensure that all members of the Fencing Team's coaching staff were complying with University policies and Title IX.

137.    Defendants' actions and lack of action with regard to its duty under its sexual misconduct prevention training and education policy caused Oldham to sustain substantial injury, damage and loss, including but not limited to: mental anguish; severe emotional distress; injury to reputation; past and future economic loss; and loss of future employment prospects.

## COUNT V

## BATTERY

### (v. Penn State and Abashidze)

138.    All Paragraphs of this pleading are incorporated herein by reference.

139.    On December 12, 2017, Abashidze intentionally caused direct bodily contact with Oldham's person without justification when he groped and kissed Oldham's arm, leg, and cheek, and grabbed her genitalia.

140.    Oldham did not consent to the contact.

141.    Upon information and belief, Abashidze was traveling on behalf of Penn State and therefore was, according to Penn State's policy TR02, acting as a representative of Penn State to the public. Applying the plain language of the policy, Abashidze was acting as Penn State's public representative and acting within the scope of his employment during the entirety of his trip regardless of the particularities of his activity at any given moment.

142.    Penn State, through the failure to train and/or supervise by Harris and Glon as complained of in Count IV, and as reflected by Harris' inability to classify Abashidze's conduct as a violation of any Penn State Policy, effectively created a culture where Abashidze's failure to recognize his own conduct as a violation of University policy was not unreasonable and therefore a negligent act with the responsibility for its consequences attributable to both Penn State and Abashidze.

143.    The language of the University's policy TR02 triggers an analysis of the doctrine of *respondeat superior* in this matter which could make Penn State share responsibility for the outcome of Abashidze's negligent actions.

144.    As a direct and foreseeable result of Abashidze's offensive and unconsented bodily contact with Oldham, she has suffered, and will continue to suffer substantial injury, damage and loss, including but not limited to mental anguish; severe emotional distress; injury to reputation; past and future economic loss; and loss of future employment prospects.

## COUNT VI

## NEGLIGENCE/GROSS NEGLIGENCE

## PUNITIVE DAMAGES

(v. All Defendants)

JOINT AND SEVERAL LIABILITY

145.    All Paragraphs of this pleading are incorporated herein by reference.

146.    The defendants, and each of them, owed to the Plaintiff the duties to keep her safe from sexual assault and harassment by Abashidze while he was traveling and acting as a representative of Penn State to the community and to handle her claims properly and in good faith.

147.   Despite these duties, the defendants, breached their duties to the Plaintiff in all of the ways set forth in this complaint, and in additional ways to be set forth and established at trial.

148.   The derogation of these duties by the defendants, individually and collectively, were willful, wanton and done with a reckless, conscious and intentional disregard of the rights, health, well-being and safety of the Plaintiff.

149.   Further, the defendants, individually and collectively, knew or should have known a derogation of these duties, was likely to result in significant injury and harm to the Plaintiff.

150.   As a direct and proximate result of the negligence and/or gross negligence of the defendants, individually and collectively, the Plaintiff has suffered substantial damage for which the defendants, jointly and severally, should be required to pay as more specifically set forth herein.

151.   Based upon the conduct of the defendants, which was, as alleged, willful and/or wanton, the Plaintiff is entitled to an award of punitive damages.

## COUNT VII

## NEGLIGENT OR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

## PUNITIVE DAMAGES

(v. All Defendants)

JOINT AND SEVERAL LIABILITY

152.   All Paragraphs of this pleading are incorporated herein by reference.

153.   The conduct of the defendant University, by and through the conduct, acts and/or omissions of the individual defendants, was either intentional, negligent and/or grossly negligent as related to the Plaintiff.

154.   The acts and/or omissions of the individual defendants were either intentional, negligent and/or grossly negligent as related to the Plaintiff herein.

155.   Upon information and belief, the actions and/or omissions of the defendants were in furtherance of the financial interests of Penn State and were driven by, among other things, the financial greed and avarice of the University.

156.   The acts and/or omissions complained of in this Complaint arose out of a duty or duties that the defendants, individually and collectively, had to Oldham to act in good faith, to deal with her claims with neutrality and a lack of bias, and to take Oldham's claims and rights under Title IX seriously.

157.   The acts and/or omissions constituted a breach of duty or duties owed to the Plaintiff by the defendants, individually and collectively.

158.   It was reasonably foreseeable to the defendants that their conduct, actions, and/or omissions that constituted a breach of the duty or duties owed to Oldham would cause her severe emotional distress and/or damage.

159.   The conduct, acts and/or omissions of the defendants, individually and collectively, that constituted a breach of their duty or duties to the Plaintiff, did in fact cause severe emotional distress and/or damage to the Plaintiff.

160.    This severe emotional distress and/or damage suffered by the Plaintiff was directly and/or proximately caused by the negligent, grossly negligent, and/or intentional conduct, acts and/or omissions of the defendants and/or each of them.

161.    The Plaintiff has been damaged as more specifically set forth herein and, due to the manner and character of the conduct, acts and/or omissions of the defendants, and/or each of them, the Plaintiff is entitled to an award of punitive damages.

### PRAYER

WHEREFORE, Plaintiff respectfully requests judgment in her favor and against defendants, jointly and severally, as follows:

162.    Compensatory damages for Plaintiff's psychological and emotional distress and damages, loss of standing in her professional community, damage to her reputation, her out of pocket expenses incurred in response to these circumstances. These damages arise under the Title IX claims, as well as the separate causes of action which stem from state law which the Plaintiff prays the Court allow to be heard under its pendent jurisdiction;

163.    Punitive damages;

164.    Injunctive relief requiring defendant University to take effective steps to eliminate discrimination and harassment in its programs and activities for all parties involved; to appropriately respond to all reported conduct that may constitute sexual harassment; to timely investigate reported conduct that may constitute sexual harassment or sexual assault; to mitigate the effects of any hostile environment that may arise from sexual harassment; to require proper training and administration of processing and investigating sexual

misconduct allegations, proper hearing of complaints, and proper treatment of those subject to sexual misconduct by employees regardless of complainant's relationship with the University;

165.    Interest on the damages she is awarded;

166.    Costs;

167.    Reasonable attorney fees; and

168.    That all issues complained of herein be tried by a jury.

Respectfully submitted and filed this the 26th day of May 2020.

<div style="margin-left:50%">

/s/ Stephen P. Lindsay
Stephen P. Lindsay
NC State Bar No.13017

/s/ Kerstin Walker Sutton
Kerstin Walker Sutton
NC State Bar No. 30008

Counselors for Plaintiff
Sutton & Lindsay PLLC
46 Haywood St., Suite 200
Asheville, NC 28701
(828) 551-6446
SPL@SuttonLindsay.com
kws@SuttonLindsay.com

</div>