## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Jennifer Oldham, | : | |
| | : | |
| Plaintiff | : | Case No. 4:20-cv-02364-MWB |
| | : | |
| v. | : | Judge Matthew W. Brann |
| | : | |
| THE PENNSYLVANIA STATE | : | |
| UNIVERSITY; CHRISTOPHER J. | : | |
| HARRIS, as agent for Penn State in | : | |
| his official capacity; WIESLAW R. | : | |
| GLON, as agent for Penn State in his | : | |
| Official capacity and in his individual | : | |
| capacity; and GEORGE G. | : | |
| ABASHIDZE, as agent for Penn | : | |
| State in his official capacity and in | : | |
| his individual capacity, | : | |
| | : | |
| Defendants. | : | Electronically Filed |
| | : | |

## FIRST AMENDED COMPLAINT
## AND DEMAND FOR JURY TRIAL

Plaintiff Jennifer Oldham, by and through her attorneys, respectfully alleges as follows:

## SUMMARY[1]

This case arises from Defendant Abashidze's sexual assault on Plaintiff Oldham while he was traveling on behalf of Defendant Penn State University's fencing program, for which Abashidze and Defendant Glon were coaches. Plaintiff is also a fencing professional who operates a fencing academy and aspires to a NCAA coaching position.

When the assault was reported by a third party to the U.S. Olympic and Paralympic Committee's SafeSport program, Abashidze and Glon made good on earlier threats to destroy Plaintiff's reputation in the fencing world. Even after Abashidze was thrice adjudicated to have committed the assault, they have convinced others that Oldham fabricated the report, with the result that she has been widely shunned, excluded from fencing events, and has lost NCAA job opportunities.

Defendant Penn State ignored Plaintiff's repeated reports of retaliatory harassment, slow-walked their investigation of the assault, dismissed Abashidze only when his suspension from USA Fencing disqualified him from a coaching role,

---

[1]    This summary is for the convenience of the Court and does not make substantive allegations that require admission or denial by the Defendants; they will be required to answer the allegations set forth in the body of the Complaint.

and refused to investigate Glon for his willful failure to report the assault to Penn State and his subjecting of Oldham to a hostile environment that has all but destroyed her fencing career.

## I.
## FACTS RELEVANT TO ALL COUNTS

1.      In the early morning hours of December 12, 2017, on a domestic flight somewhere over the Great Plains region of the United States, Defendant George Abashidze thrust his hand between Jennifer Oldham's legs and grabbed her genitalia without her consent.

2.      Abashidze made numerous lewd comments, touched Oldham's legs, arms and face without her consent, and repeatedly demanded that Oldham have sex with him during the four-hour flight, all conduct unwelcomed by Oldham and within earshot of nearby passengers.

3.      At the time, Abashidze was employed as an Assistant Coach and traveling as a representative of Defendant Pennsylvania State University with its men's and women's fencing team. Abashidze was directly supervised in his employment by Defendant Wieslaw Glon, the fencing team's Head Coach.

4.      Under written Penn State policies, both Abashidze and Glon were on notice from Penn State that all coaches were classified as "responsible employees" and, as such, each of them was required to have a working knowledge of and

participate in training related to the University's sexual misconduct policy, including a responsible employee's duty to report any incident of possible sexual misconduct to Penn State's Title IX Coordinator.

5.      Penn State had ostensibly enhanced its sexual misconduct prevention and response training requirements for its Athletic Department coaches and staff, after egregious shortcomings in the University's awareness of and institutional interest in preventing sexual misconduct in the Athletic Department were exposed when the Jerry Sandusky serial child molestation tragedy was uncovered in 2011.

6.      At the time Abashidze committed the assaults and batteries on Oldham, they were on a flight from Portland, Oregon to Chicago O'Hare Airport where each had a connecting flight to another city.

7.      Abashidze was returning from coaching Penn State fencing team members at a USA Fencing[2] North American Cup tournament.

8.      Oldham had also attended the North American Cup tournament as the coach for a fencer from her private club in Durham, North Carolina.

---

[2]      USA Fencing is the official National Governing Body of the sport of fencing and is authorized by the United Stated Olympic and Paralympic Committee. *See:* https://www.usafencing.org/ (last retrieved April 16, 2021).

9.    On the flight, Abashidze was in an aisle seat with Oldham on his right in her center seat and another passenger, also returning from the fencing event, in the window seat of a three-seat row.

10.    Although they were not traveling together, Oldham was generally acquainted with both Abashidze and the passenger on her right prior to the flight.

## II. THE PARTIES

11.    Plaintiff Jennifer Oldham is the owner and Head Coach of Mid-South Fencers' Club, a private fencing club and training facility located in Durham, North Carolina. Oldham is a resident of Durham County, North Carolina, a University of North Carolina graduate, and a native North Carolinian.

12.    Defendant Pennsylvania State University[3] ("Penn State" or "the University") is a state-related, land-grant, research university, is independently governed, and is associated with Pennsylvania's Commonwealth System of Higher Education.

_____

[3]    Penn State has 24 physical campuses as well as online certification and degree programs. Unless otherwise noted, "Penn State" herein refers to the State College campus in Centre County, Pennsylvania.

13.    Defendant Christopher Harris was, at all relevant times herein, Penn State's Title IX Coordinator and responsible for receiving all reports of sexual misconduct at the University. Harris assumed the position of Title IX Coordinator in July 2018, after working in student affairs administration for 15 years. He is a resident of Centre County, Pennsylvania.

14.    Defendant Wieslaw Glon is the Head Coach of Penn State's fencing team, has been coaching at Penn State since 1985, and is a resident of Centre County, Pennsylvania.

15.    Defendant George Abashidze was at all relevant times herein, an Assistant Coach of Penn State's fencing team, had been coaching at Penn State for ten years, and is a resident of Centre County, Pennsylvania.

## JURISDICTION AND VENUE

16.    Oldham brings this action to seek redress for sexual harassment and discrimination based on gender and sex by the Defendants, pursuant to Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a).

17.    This Court has federal question jurisdiction conferred by 28 U.S.C. § 1331, which gives district courts original jurisdiction over all civil actions arising under the Constitution, laws, and treaties of the United States. Because this Court has jurisdiction to address the controversy before it, 28 U.S.C. § 2201 grants the Court authority to declare the rights of the parties before it, and 28 U.S.C. § 2202

authorizes the Court to grant such further relief, including injunctive relief, as the Court may deem necessary and proper.

18.    Plaintiff also has stated causes of action under the laws of the State of Pennsylvania because the Defendants have violated rights secured thereunder. Her state claims include battery, failure to train and supervise, negligence/gross negligence, negligent and/or intentional infliction of emotional distress, and civil conspiracy to commit an unlawful act. Those causes of action are so related to the other claims in this case, over which this Court has original jurisdiction, that they form a part of the same case or controversy under Article III of the United States Constitution. Accordingly, this Court has supplemental jurisdiction over those claims pursuant to 28 U.S.C. § 1367.

19.    This Court also has diversity jurisdiction pursuant to 28 U.S.C. § 1332, as there is complete diversity of citizenship between Plaintiff and all Defendants, and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

20.    Defendant Penn State is a legal entity organized and operating primarily in the Commonwealth of Pennsylvania.

21.    Defendants Harris, Glon and Abashidze are each, upon information and belief, residents of Centre County, Pennsylvania.

7

22.    Venue is proper in the Middle District of Pennsylvania pursuant to 28 U.S.C. § 1391(b)(2), in that a substantial part of the events, acts, or omissions giving rise to Oldham's action occurred in and around Centre County, Pennsylvania.

23.    Plaintiff Jennifer Oldham resides in Durham County, North Carolina.

### III. APPLICABLE LAW AND POLICY

24.    Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681(a), states in relevant part: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefit of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

25.    Title IX is implemented through the Code of Federal Regulations. See 34 C.F.R. Part 106.

26.    In *Gebser v. Lago Vista Independent School District*, 524 U.S. 274 (1988), the United States Supreme Court recognized that a recipient of federal educational funds intentionally violates Title IX, and is subject to a private damages action, where the recipient is "deliberately indifferent" to known acts of teacher-student discrimination.

27.    In *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999), the Supreme Court extended the private damages action recognized in *Gebser* to cases where the harasser is a student, rather than a teacher.

28.    *Davis* held that a plaintiff may prevail in a private Title IX damages action against a school, where the funding recipient is deliberately indifferent to sexual harassment of which it has actual knowledge, and the harassment is so severe, pervasive and objectively offensive that it can be said to deprive the victim of access to the educational opportunities or benefits provided by the school. *Davis*, 526 U.S. at 1669–76.

29.    Hostile environment discrimination is often a "continuing violation," so that a plaintiff may recover where "all acts which constitute the claim are part of the same unlawful employment practice and ... at least one act falls within the applicable limitations period." *Mandel v. M&Q Packaging Corp*, 706 F.3d. 157, 166–167 (3d Cir. 2013). Employers are liable for retaliation and the hostile environment created thereby, when they "knew or should have known of the harassment and failed to take prompt remedial action." *Kunin v. Sears Roebuck & Co.*, 175 F.3d 289, 293–94 (3d Cir. 1999).

30.    Penn State established an employee travel policy titled "TR02 Penn State Travel Policy" ("TR02") for university employees "traveling on behalf of the university." TR02 had an effective date of January 5, 2017 and was in effect at all relevant times herein.

31.    TR02 states Penn State's business travel policies for employees including the language: "Those who travel on behalf of the University hold a

position of trust and responsibility. They work independently, represent the University to the outside community, and are authorized to spend University funds for travel."

32. Penn State adopted an administrative policy addressing discriminatory acts prohibited pursuant to Title IX titled "AD85 Sexual and/or Gender-Based Misconduct and Harassment." AD85 had an effective date of January 27, 2014 and was in effect at all relevant times herein.

33. AD85 states Penn State's official policy on sexual misconduct and harassment policy and, among other things, contextualizes prohibited conduct. "Sexual harassment committed by an employee … can lead to discipline … when: … 3. Such conduct is sufficiently severe or pervasive so as to substantially interfere with the harassed individual's employment, education or access to University programs, activities and opportunities, or creates a hostile or offensive environment for that individual or others."

34. AD85 defines "Responsible Employee" as "[a]ll Penn State employees who are not Confidential Employees. Responsible Employees are required to report incidents of possible Prohibited Conduct to the Title IX Coordinator …"

35. AD85 allows for complaints by those outside of Penn State, to wit "External Complaints: The University encourages all individuals with a pertinent complaint to follow the process in this Policy."

36.    Penn State establishes in AD85 that "[o]nce the University receives clear notice, prompt and equitable corrective measures will be taken to stop sexual or gender-based harassment or misconduct, to prevent its recurrence, and to remedy its effects."

37. Penn State's sexual misconduct procedures address matters of sexual harassment and retaliation in relation to allegations of sexual misconduct. The procedures define retaliation as "[a]cts or words taken against an individual because of the individual's participation in a protected activity. ... Protected activity includes an individual's good faith 'participation in the reporting, investigation, or resolution of an alleged violation of this Policy' ... ." The procedures further provide that retaliation "may be committed by the Responding Party, the Reporting Party, or any other individual or group of individuals."

## COACH GLON'S COVER-UP

38.    Traumatized by Abashidze's sexual assault, Oldham shared the details of the event with her husband, Jeff Kallio, upon arriving home in North Carolina.

39.    Oldham also sought advice about how to deal with the assault from her professional mentor and former fencing coach, Ed Korfanty, a long-time friend of Glon's.

40.    On January 15, 2018, Korfanty called Glon to speak with him about Oldham's assault.

41.    Glon then spoke with Abashidze about his conversation with Korfanty.

42.    Glon in his official capacity as agent for Penn State and Abashidze in his individual capacity conspired together to decide Glon would not share information about Abashidze's misconduct with Penn State's Title IX Coordinator or anyone else in the Penn State Athletic Department hierarchy.

43.    In February 2018, Glon and Abashidze traveled to Durham, North Carolina with the Penn State fencing team for a tournament at Duke University.

44.    Glon and Oldham arranged to meet while Glon was in Durham.

45.    Oldham detailed for Glon the sexual assault that happened on the plane at the meeting and gave him a copy of a written summary of the assault that she had created as a way to deal with the trauma and watched as he read it. Oldham felt that that she had made an official report of the assault to Penn State by telling Glon about it.

46.    Oldham asked Glon at the meeting if he was going to report Abashidze's assault to the Athletic Department at Penn State.

47.    Glon said "no."

48.    Glon attempted to manipulate and/or intimidate Oldham by using his stature in the sport and at Penn State to convince her not to report the incident to the

United States Olympic and Paralympic Committee's SafeSport[4] program by informing her that it would be embarrassing for her if the assault became known and no one would believe her if she claimed Abashidze had sexually assaulted her.

49.    Glon was aware that Penn State would learn of an investigation at SafeSport and that it would jeopardize Abashidze's employment at Penn State.

50.    Glon then brought Abashidze into the conversation with Oldham and directed him to apologize to her, after which the Durham meeting ended.

51.    The individual who was sitting on Oldham's right in the plane and who witnessed some of Abashidze's conduct had submitted a report about the incident to SafeSport.

52.    Following Oldham's February 2018 discussion with Glon, Oldham was advised by others to report the sexual assault to the SafeSport program but she was hesitant to do so out of fear for her career and other reputational consequences that Glon had mentioned.

---

[4]    The United States Center for SafeSport is an independent organization focused on ending all forms of abuse in sport. It is federally authorized under the Protecting Young Victims from Sexual Abuse and Safe Sport Authorization Act of 2017 (Public Law No: 115126, 2/14/2018). SafeSport develops resources and policies to safeguard athletes and is the exclusive authority to respond to sexual misconduct within the US Olympic and Paralympic Committee and each sport's National Governing Body.

53.    Oldham was told by one professional colleague, "If you don't report it, I will."

54.    In April 2018, Oldham attended a USA Fencing North American Cup tournament in Richmond, Virginia. Glon was also at the tournament coaching members of the Penn State team. Oldham was approached by Korfanty, who asked if she would speak with him and Glon over coffee.

55.    During their conversation, Glon pressured Oldham not to engage with SafeSport and, if she was questioned by them, to refute the allegations filed by the third-party witness.

56.    Glon again told Oldham that she would not be believed if the story was uncovered or made public, that SafeSport would take no action against Abashidze, and that she should not bother speaking with SafeSport.

57.    Glon then tried to impress upon Oldham what a "good guy" Abashidze was, and how the growing fallout from the assault was causing him anxiety, stress, and a loss of sleep. Oldham believed that Glon thought Abashidze had become a victim.

58.    Oldham suggested to Glon that he had a duty to report the incident to Penn State.

14

59.    Glon told Oldham that he did not believe Abashidze was a "danger" to the team and that Glon was "watching him closely."

60.    SafeSport investigated the allegations against Abashidze, found him to be responsible for the assault, and publicly suspended Abashidze from any association or involvement with USA Fencing[5] sanctioned events and programs in 2018.

61.    Abashidze appealed the suspension, and an arbitration hearing was held at which witnesses were called and testimony was given by Abashidze, Glon, Oldham, and others.

62.    SafeSport again found Abashidze responsible for the assault and harassment of Oldham and publicly suspended Abashidze from any involvement with USA Fencing for a year.

**PENN STATE'S HISTORY OF COVER-UP**

---

[5]    USA Fencing is the authorized National Governing Body for the sport of fencing in the United States. https://www.usafencing.org/ last retrieved May 26, 2020.

15

63.    In November 2011, Jerry Sandusky, a former Assistant Coach for Penn State's football team, who had worked under Head Coach Joe Paterno, was indicted on 52 felony counts for child sexual abuse that occurred between 1994 and 2009.

64.    The 2011 grand jury investigation into the Sandusky allegations had revealed that Sandusky's criminal behavior was known to Penn State as early as 1998. In 2002, one of Sandusky's assaults was witnessed by a Penn State football staff employee who then reported the conduct to members of the athletic department, including Head Coach Paterno. However, members of the athletic department decided to keep the information secret and failed to act to prevent further abuse.

65.    Head Coach Paterno was fired in 2011 before the completion of his 46th season at Penn State.

66.    Louis Freeh, a former Director of the FBI, was retained by Penn State's Board of Trustees to conduct an internal investigation into the Sandusky affair. The 2012 Freeh Report concluded that high-ranking Penn State officials had been aware of Sandusky's criminal behavior since approximately 1998, had failed to take any meaningful, appropriate action, and had essentially empowered Sandusky to be able to continue his pattern of sexual abuse and misconduct.

67.    Sandusky was convicted of 45 counts and was sentenced to 30 to 60 years in prison.

16

68.    Former Athletic Director Timothy Curley, together with former Penn State Vice President Gary Schultz, and former Penn State President Graham Spanier, were criminally charged in the cover-up. Those charges included failure to report child abuse, obstruction of justice, and perjury.

69.    The impact of Sandusky's criminal conduct and the acts of willful blindness and/or cover up of that behavior by others at Penn State had profound consequences for the University. In addition to the University officials criminally charged, others were forced to resign, civil lawsuits were filed, and the NCAA imposed sanctions that included a $60 million fine, a four-year post-season competition ban, athletic scholarship reductions, and retroactive forfeitures of football program wins.

70.    Mark Emmert, then NCAA President, explained that the extraordinary sanctions imposed were "not to be just punitive, but to make sure the university establishes an athletic culture and daily mindset in which ... [athletics] will never again be placed ahead of educating, nurturing, and protecting young people."

71.    In May 2019, a reporter from the Philadelphia Inquirer asked Penn State President Eric Barron about the Oldham allegations and Barron told the reporter he would "be surprised" if a coach knew of an issue like Oldham's and did not report it.

17

## OLDHAM'S EFFORTS TO SEEK REDRESS

72.     On June 30, 2018, Oldham's husband Jeff Kallio, also a fencing professional, concerned for Oldham's well-being, hoping to help her achieve some closure, and without Oldham's knowledge, contacted Penn State's Athletic Director, Sandy Barbour by email about his wife's assault.

73.     Harris and Penn State Athletics Integrity Officer Robert Boland then contacted Kallio by email and phone to discuss the situation in more detail.

74.     Boland and Harris told Kallio that his report of Oldham's allegations against Abashidze and Glon that day was the first they had heard of the situation.

75.     Harris and others initiated a conference call phone interview with Oldham on August 14, 2018, during which she told Harris and others at Penn State details about Abashidze's assault and Glon's failure to report the assault, and she asked Harris to investigate both Penn State employees.

76.     Harris began in Affirmative Action Office ("AAO") investigation into Abashidze's assault.

77.     Oldham heard nothing more from Harris between August 2018 and February 2019.

78.     During that six-month period, the SafeSport process was on-going, and Oldham continued to endure harassment and retaliation through electronic media

and in person at international competitions, which was instigated by Abashidze's and Glon's falsehoods shared with their friends and supporters in the fencing community and those who were doubters of the burgeoning international #metoo movement.

79.    Abashidze and Glon were aware of, and took no steps to stop, the harassment and acts of retaliation against Oldham in 2018, which they had caused and encouraged with false narratives regarding the SafeSport complaint.

80.    It was only when Oldham proactively contacted Penn State in February 2019 to find out what had happened with her claim that she got an update of sorts when she was told the investigation was "ongoing."

81.    Shortly thereafter, in February 2019, Harris emailed Oldham the ~~initial~~ AAO Initial Determination in which he had substantiated and admitted as true her factual allegations of the assault and harassment by Abashidze.

82.    Despite the substantiation, Harris' AAO Initial Determination then concluded that Abashidze's public groping of Oldham's genitalia and his other acts of unwanted touching and ~~verbal~~ sexual harassment inexplicably had *not* violated any Penn State policy.

83.    The AAO Initial Determination did not mention Glon's failure to report Abashidze's assault, or his other behavior toward Oldham.

84.    Although she tried several times to arrange a personal meeting with Harris, Oldham was overtly and repeatedly discouraged from traveling to Penn State to meet with him in person to discuss her response to the Initial Determination, a meeting that was expressly permitted by Penn State's Policy and Procedures.

85.    Oldham communicated her thoughts and many disagreements with the Initial Determination in a brief phone conversation with Harris and others. She told them that she believed she could have better conveyed those factual inconsistencies along with the depth of her disappointment and dismay in person.

86.    Harris's AAO Final Determination reached the same conclusions about Abashidze's assaultive behavior and the University policies which were wholly unable to protect people from sexual assaults committed by employees representing Penn State.

87.    There was no opportunity for Oldham to review and provide comment or corrections on Harris' AAO Final Determination as was expressly permitted by the University's Title IX policy.

88.    There was no mention in Harris' AAO Determination of Glon's behavior, including his failure and refusal to report Oldham's sexual assault, which by this juncture had been adjudicated against Abashidze by SafeSport twice.

89.    The Final Determination deferred reaching an AAO or Title IX-based final conclusion, until after a future and separate investigation and determination by Boland's parallel Inter-Collegiate Athletics ("ICA") investigation that Oldham was told would apply policies and procedures in the Penn State Athletic Code and rules promulgated by the NCAA.

90.    There was no Penn State policy or procedure that supported a deferral of an outcome notice or that contemplated a parallel investigation of Title IX-related conduct outside of the Title IX office.

91.    Oldham was not asked to be involved in or given an opportunity to review or comment on an ICA report. She was never given notice of the ICA investigation's outcome or its impact on the AAO outcome.

92.    Oldham finally called Penn State again to ask about the ICA outcome on Abashidze and Harris told her the process was complete and he could not share any further information with her.

93.    Harris then obliquely suggested that Oldham might be able to "figure out" what happened with Abashidze by looking at the University's website.

94.    In April 2019, not understanding why Glon's refusal and ongoing failure to report Abashidze's assault was not being investigated, Oldham submitted

to Harris a written Title IX complaint, alleging that Glon had sexually harassed and discriminated against her based on sex and gender, when he:

     a.    Attempted to intimidate and manipulate her to keep her from reporting the assault to Penn State or SafeSport;

     b.    Told her no one would believe her if she said Abashidze assaulted her;

     c.    Suggested she would be embarrassed, and her professional reputation would suffer if she made a report;

     d.    Implied that everyone in their predominantly male sport would conclude she was lying about the assault;

     e.    Told her he was not going to report her claim of sexual assault to anyone in Penn State's Athletic Department;

     f.    Stated that she didn't know how to take a joke; and

     g.    Obstructed Penn State's timely and appropriate institutional response to her sexual assault complaint.

95.    Penn State never responded to Oldham's complaint about Glon. There was no opportunity for her to be interviewed, see a report, review evidence, participate in a hearing, elect to appeal the outcome, or question the process.

96.    Oldham was not told of the final outcome of either the Abashidze or Glon complaint and did not become aware that Penn State was required to disclose those outcomes to her until March 2020, when a United States Department of Education Office of Civil Rights ("OCR") compliance review of sexual misconduct cases at Penn State spanning the years 2011 to 2020 was published, revealing that OCR:

a.    Found that the manner in which Penn State responded to sexual misconduct claims has been under constant official review since 2011 by one entity or another, each of which generated detailed findings or reports. In addition to OCR's independent review, the reviewing entities included the Pennsylvania Attorney General's Office, the Pennsylvania General Auditor's Office, and Freeh's independent investigation team;

b.    Reviewed over 300 sexual misconduct cases at eight Penn State campuses spanning ten years;

c.    Summarized only ten of those 300 matters in its 2020 letter of findings (without identifying any parties), including a summary that combined Oldham's Title IX complaints against Abashidze and Glon, as well as her interactions with Penn State. OCR referred to Oldham's situation and Penn

State's improper handling of her claims in both the letter of findings and the resolution agreement entered into with Penn State;

      d.      Determined that the University had failed to respond promptly and equitably to complaints of sexual harassment, including complaints initially reported to the Athletic Department in 2017-18, one of which was Oldham's complaint about Abashidze;

      e.      Was told by the University that the Athletic Integrity Officer always referred all claims against employees that had Title IX implications to the Title IX Coordinator for handling by the Title IX Coordinator and an Associate Vice President and had been doing so ever since the creation of the AIO position in 2013.

      f.      Determined that the University did not follow its own policies and procedures when there was a delay in notifying the Title IX Coordinator of sexual harassment allegations initially reported to the Athletic Department.

      g.      Determined that the University's Title IX procedures did not sufficiently provide for notice of the outcome of a complaint to the parties.

97.     OCR issued a letter of findings and entered into a resolution agreement with Penn State on March 27, 2020 in an attempt to bring Penn State's sexual misconduct policies and procedures into compliance with Title IX.

98.     The OCR Review surveyed the post-Sandusky decade at Penn State and found systemic failure to comply with Title IX. The Review analyzed over 300 cases of sexual misconduct at Penn State, as reported from 2011-2020, and concluded that the University had failed to respond promptly and equitably to complaints of sexual harassment.

99.     Of the 300 cases surveyed, OCR singled out 10 cases (without identifying the parties) as exemplifying Penn State's systemic Title IX noncompliance, specifically including Ms. Oldham's complaints. OCR noted Penn State's failure to comply with its own policies, including the Athletics Department's failing to notify the Title IX Coordinator of sexual harassment allegations.

100.     OCR issued a letter of findings and entered into a resolution agreement with Penn State on March 27, 2020, in an attempt to bring Penn State's sexual misconduct policies and procedures into compliance with Title IX. In both its 2020 letter of findings and the resolution agreement entered into with Penn State, OCR summarized Penn State's mishandling of Ms. Oldham's complaints against both Abashidze and Glon as typical of the Title IX violations it sought to rectify.

**<u>INJURIES TO OLDHAM FROM DEFENDANTS' COURSE OF CONDUCT</u>**

101.    Due to the failures of Penn State's Title IX process and an unwillingness of Glon and Penn State's administration to respond to Oldham complaints in a timely and meaningful way, Oldham has:

a.    Suffered and continues to suffer severe mental distress and emotional injuries;

b.    Been subjected to a hostile environment in Penn State programs and activities, to wit, fencing events at which Penn State athletes and/or coaches and/or Glon's or Abashidze's supporters participate;

c.    Scaled back her attendance at most national-level tournaments in the United States, as well as workshops and collegiate recruitment events out of fear of encountering Abashidze or Glon to the detriment of her business and family;

d.    Been abruptly dis-invited along with several of her club's members from an elite camp at Glon's friend Korfanty's club in Oregon after Korfanty had suffered a negative response for making a public statement when asked about Oldham's claim of assault that "maybe she provoke[d] him";

e.    Been falsely accused of causing a coach to lose a job opportunity when questions were raised by the potential employer about the coach's personal history;

f.      Suffered the stress and indignity of being interviewed by an FBI agent with questions about the in-flight sexual assault by Abashidze, without knowing who contacted the FBI or how they became involved;

g.      Suffered additional stress in managing the anxiety these events have caused her children, also active in the sport of fencing, to experience;

h.      Suffers loss of sleep; lack of concentration and inability to perform work tasks, due to the enormous distraction caused by these circumstances; feelings of depression, despair, and humiliation; as well as

i.      Feelings of intense grief at the loss of friendships, and feelings of betrayal by former friends, professional peers, and her primary coach-mentor (Korfanty).

102. The defendants' collective actions have effectively excluded Oldham from participation in, denied her the benefits of, and subjected her to discrimination in Penn State programs and activities that she had previously enjoyed.

103.  Due to the failures of Penn State's Title IX process, Abashidze and Glon were able to pursue their retaliatory campaign against Oldham in the fencing world, creating the hostile environment at Penn State and elsewhere that plagues her to this day. Because Glon and Penn State's administration were unwilling to respond to Oldham's complaints in a timely and meaningful way, Oldham has suffered, and

27

continues to suffer, injuries to her reputation, her livelihood, her career potential, and her and her family's psychological well-being.

104.  Oldham has been subjected to a hostile environment for both herself and her students in Penn State fencing programs, events, and activities, effectively excluding her from prestigious fencing events hosted by Penn State. For example, Oldham felt too uncomfortable to attend an invitational tournament held at Penn State the weekend of November 3, 2018, after Abashidze had been suspended from USA Fencing, but before he was terminated from Penn State.

105.  Penn State is a powerhouse fencing program and frequently hosts prestigious fencing competitions as well as workshops and recruitment opportunities for prospective students. One such marquee event was the NCAA Championship held at Penn State in March, 2021, where one of Oldham's proteges competed for an individual championship and placed second.

106.  As a result of the hostile environment Glon and Abashidze created for Plaintiff in Penn State programs, and elsewhere in the competitive fencing world, she has lost employment opportunities and access to competitive events. Oldham's career objective is a coaching position with a collegiate NCAA Division I fencing program. Since Abashidze's sexual assault set in motion this chain of events, she has applied for four such positions, at Northwestern University and at the University of

North Carolina, for which she was eminently qualified. In January 2019, Oldham was told that Glon had retaliated against her by interfering with her job prospects at UNC, when he called the UNC Fencing Head Coach "to see if he can do anything about Jennifer." She has been given to understand that she would not even be considered for such positions in the present environment, as she is viewed as radioactive in the collegiate fencing world.

107.   Oldham has been required to expend much time and effort to navigate these circumstances so as to protect her students from anticipated retaliation. It is her belief that Penn State, and other NCAA fencing programs headed by friends of Glon and Abashidze, would not recruit or offer fencing scholarships to any of her students, thus reducing the appeal of her fencing academy. As a result, she has lost recruitable (college-bound) athletes to a competing neighboring club. At fencing competitions, Ms. Oldham has had to take all possible measures to protect her students from possible disparate and unfavorable treatment by referees friendly to Glon and Abashidze.

108.   As a result of all these circumstances, and prior to the pandemic shutdown of events in 2020, Plaintiff dramatically reduced her attendance at regional- and national-level fencing tournaments in the United States, international tournaments, games and events, workshops, and collegiate recruitment events, at

which she expected elite Penn State athletes to compete, out of extreme anxiety over encountering Abashidze or Glon. When she does attend such events, she experiences shunning and exclusion from social/networking events, and general hostility from friends of Glon and Abashidze, who have accepted their false version of these events. Oldham has heard colleagues minimize and dismiss the assault because Abashidze did not "present an immediate threat to minors," or Abashidze merely "brushed someone's arm on a plane."

109.   After his ban from USA Fencing was lifted, Abashidze obtained a position as a referee at USA Fencing events. As a result, Plaintiff was effectively excluded from regional competitions in Virginia, in Spring 2019 and Fall 2019.

110.   In May 2019, Plaintiff was abruptly dis-invited, along with several of her club's members, from an elite camp at Glon's friend Korfanty's club in Oregon, after Korfanty had suffered a negative response for publicly disparaging her complaint of sexual assault by suggesting that "perhaps she provoked" Abashidze.

111.   The Defendants' collective actions, and Defendant Penn State's and Harris' failures to act when repeatedly informed of the damaging actions of Glon and Abashidze, have effectively excluded Oldham and her students from, denied her the benefits of, and subjected her to discrimination in Penn State programs, events, and activities that she had previously participated in and benefitted from.

30

112. This action alleges violations of Title IX and the denial of Oldham's rights thereunder.

## COUNT I
## VIOLATION OF TITLE IX and CIVIL CONSPIRACY
## 20 U.S.C. § 1681, et seq. (Deliberate Indifference)
### (v. All Defendants)

113.   All Paragraphs of this pleading are incorporated herein by reference.

114.   Title IX prohibits discrimination on the basis of sex in a school's educational programs or activities, which include all of the school's operations. 20 U.S.C. §§ 1681(a), 1687.

115.   Penn State receives federal grant funding and/or has students who receive federal student financial aid, and thereby is a recipient of federal funds and must comply with Title IX.

116.   A victim of discrimination based on her gender has a private right of action under Title IX against the offending school for monetary damages and equitable relief.

117.   As set forth above, Penn State had actual notice of the tortious sexual harassment and assault when Glon, a "responsible employee," first learned of it from Korfanty in January 2018.

118.   Oldham's claim of sexual assault and harassment against Abashidze, a tortious encounter of which Penn State had actual knowledge via Glon, and to which it could have responded to in January 2018, subjected Oldham instead to further tortious acts of sexual harassment and discrimination based on gender and sex by Glon while in the furtherance of his Penn State employment duties in Durham in February 2018, in Richmond, Virginia in April 2018, and on mostly unknown dates thereafter, as more fully set forth herein.

119.   Abashidze (in his individual capacity) and Glon (in his official capacity) engaged in an ongoing conspiracy together starting in January 2018, when Glon first told Abashidze about Korfanty's call, through December 2018 when Glon and Abashidze both testified that Oldham was a "liar" at the SafeSport hearing. They acted first in an attempt to keep Oldham from reporting the assault, and later to foster a general belief that she was not credible and should not be believed, all in order to delay or avert potential consequences for Abashidze.

120.   As set forth above, Abashidze, Glon, Harris, and the University engaged in a series of concerted actions and inactions that concluded with Harris' Final Determination in April 2019, stating that Abashidze had sexually assaulted and harassed Oldham when he groped her genitalia but had not violated any University policy by doing so.

32

121.   Harris and Boland agreed to defer and/or cover up the AAO outcome until after the secret ICA outcome was determined, in a process to which Plaintiff had no access whatsoever. Penn State had no policy provision that allowed this type of "lateral pass" of an investigation in the Title IX process, and it was contrary to Penn State's practice and policy under which ICA was subordinate to AAO in Title IX-related incidents.

122.   Harris conspired with Boland, Glon, and with Abashidze in his individual capacity, to take advantage of ambiguities in competing and inconsistent Penn State sexual misconduct policies in order to keep information about the Abashidze outcome from Oldham, contrary to Penn State's Policy AD85 and federal Title IX guidance.

123.   Glon in his official capacity as agent for Penn State and Abashidze in his individual capacity conspired to keep knowledge of the SafeSport investigation secret from the University throughout the SafeSport investigation and hearing process and up until the moment Abashidze was suspended from USA Fencing and his violation of USA Fencing and SafeSport policy became a public record.

124.   To Plaintiff's information and belief, Penn State dismissed Abashidze from his position as Assistant Coach only when it had no choice, because Abashidze's public suspension from USA Fencing for sexual misconduct made him

ineligible to work as an NCAA Fencing coach at Penn State. Thus, despite having actual knowledge of the assault via Glon in January 2018, Penn State did not alter Abashidze's employment status for well over a year, when his suspension by USA Fencing became public record and he lost the privilege of participating in elite, collegiate, and Olympic level fencing activities and entities associated with USA Fencing.

125.  The Defendants' acts of deceit and chicanery were part of a conspiracy intended to preserve the reputations and resources of each and all of the Defendants, at the expense of Oldham's rights as a complainant and victim under Title IX.

126.  OCR's acknowledgment in its March 2020 letter of findings that the University's Title IX procedures did not sufficiently provide for notice to parties of the outcome of a complaint, and its specific references to Ms. Oldham's complaints, support the contention that Harris's "no policy violation" determination and failure to provide Oldham notice of a final outcome in the Abashidze matter was willfully erroneous and an attempt to avoid consequences for all Defendants.

127.  Based on Penn State's own policies and federal Title IX guidelines, Harris's conclusion that Abashidze violated no Penn State policies was clearly and willfully in error. Harris wrote in the AAO Initial Determination that Oldham's ability to participate in Penn State's educational programs or activities was not

34

diminished by Abashidze's sexual assault. Oldham disputed that contention during the investigation, and again in her response to the AAO Initial Determination. The AAO Final Determination was unchanged on that issue.

128.  Harris did not acknowledge Oldham's express statements that her ability to participate as a coach, referee, spectator, or athlete, or to have her club's athletes participate in any tournament, trip, camp or other event that Penn State's championship fencing team or internationally renowned coaches attend – all Penn State "activities" under Title IX – was dramatically impaired due to the hostile environment created by Abashidze's and Glon's conduct, and her ongoing fear of a repeated occurrence and/or retaliation whenever she encountered Abashidze, Glon and their friends and supporters.

129.  Harris did not acknowledge that Oldham's ability to position her college scholarship-eligible athletes to visit Penn state or to be recruited by Penn State, perennially an NCAA powerhouse and championship contender and trainer of Olympians, was substantially impaired by the hostile environment created by the Defendants. Athlete recruitment through athlete campus visits, coach home visits, and scouting at athletic events are all Penn State activities in which an athlete's coach is expected to participate.

130.    Abashidze in his individual capacity and one or more of the other Defendants conspired to have Harris produce an AAO Final Determination that deferred a conclusive outcome to a future date – a future date that never arrived.

131.  Penn State further demonstrated its deliberate indifference when after it had become aware of Abashidze's intimidation and harassment of Oldham in February 2018 in Durham, no action was taken thereafter to deter Glon's further intimidation, harassment and discrimination against Oldham in April 2018 and refusal to investigate Glon's failure to report the assault.

132. To Plaintiff's information and belief, the Defendants' conspiracy to protect Glon from consequences included a conversation or an interview by Harris and/or other Penn State representatives with Glon in his individual capacity, in which Glon's personal interest in preserving his employment status was primary to his obligation to serve Penn State's interest.

133.    OCR acknowledged in its March 2020 letter of findings that the University's Title IX procedures did not sufficiently provide for notice of the outcome in its reference to Oldham's complaints. The Defendants' failure to communicate any information to Oldham related to its investigation into her formal Title IX complaint about Glon could reasonably create an inference that the

information, if communicated, would not have been received favorably by her, and that the refusal to investigate Glon was legally problematic.

134.    The deliberate indifference and unlawful discrimination by the combined acts of the Defendants was in violation of Title IX, and proximately caused Oldham to sustain substantial injury, damage, and loss, including but not limited to mental anguish, severe emotional distress, injury to reputation, injury to her livelihood, past and future economic loss, and loss of future employment prospects.

## COUNT II
## VIOLATION OF TITLE IX and CIVIL CONSPIRACY
## (20 U.S.C. § 1681, et seq.) (Retaliation/Hostile Environment)
### (v. All Defendants)

135.    All Paragraphs of this complaint are incorporated herein by reference.

136.    As alleged herein, Defendants Glon and Abashidze have systematically retaliated against Plaintiff Oldham for her cooperation with the SafeSport tribunal that eventuated in Abashidze's adjudication, suspension from USA Fencing, and eventual dismissal from his position at Penn State – even though Ms. Oldham was a reluctant complainant who did not initiate the SafeSport investigation.

137.   To save face and to minimize the consequences for Abashidze, he and Glon have told all their friends and associates in the male-dominated fencing world that Oldham is a "liar" (as they testified at the November 2018 arbitration hearing). They have spread a narrative that Abashidze merely "brushed someone's arm on a plane," as others have repeated his version to Plaintiff. Abashidze and Glon have told everyone they could reach in the competitive fencing community that Abashidze has been the innocent victim of Oldham's "lies." Never mind that Abashidze has been repeatedly adjudicated to have committed the sexual battery as alleged – twice by Penn State itself – Abashidze and Glon have been believed, on the basis of their gender and their status in the fencing world.

138.   Abashidze and Glon have thereby created a continuing hostile environment for Oldham, to the extreme detriment of her career and professional life and mental well-being. She first became aware of the Defendants' calumnies when she was told of Glon's interference with her application for employment at the University of North Carolina in the latter half of 2018, after the SafeSport inquiry commenced.

139.   The harassment and hostility generated by Abashidze and Glon quickly manifested in Oldham's professional life. When she attends fencing events, she encounters pervasive shunning and hostility from Defendants' friends and

38

associates. She is excluded from social/networking events. There are repercussions for her students, and the necessity of doing what she can to protect them causes her enormous stress and anxiety. She has been dis-invited from prestigious events and has lost students to other clubs as a result of these reduced opportunities at her. In short, she has been subjected to severe, pervasive, and continuing humiliations and interference with her professional life, because of Defendants Glon and Abashidze's retaliatory behavior.

140.    Moreover, Penn State and Harris were repeatedly informed of these behaviors and allowed them to continue unchecked. Oldham's husband Jeff Kallio first informed Harris and Boland of the Defendants' threats and harassment in July, 2018. Oldham repeatedly reported their behavior to Harris and others at Penn State, culminating in her formal Title IX complaint against Glon in April 2019. Penn State did nothing, failing to initiate any Title IX proceedings against Glon, and dismissing Abashidze only when they had no alternative, well over a year after Oldham reported the sexual assault. Clearly, Penn State's message, especially as to Glon, was that he was free to behave as he pleased toward Oldham.

141.    Having ignored repeated reports that their employees were creating a hostile environment, with the result that Ms. Oldham has had to endure the near-

destruction of her fencing career, Penn State is responsible on the basis of *respondeat superior*.

142.   As previously alleged, all Defendants conspired to allow this behavior to continue, by agreeing to slow-walk and bury Oldham's Title IX complaints, in order to minimize consequences for the University and the individual Defendants.

143.   The conspiracy by the Defendants to commit these unlawful acts of discrimination has proximately caused Oldham to sustain substantial injury, damage and loss, including but not limited to mental anguish; severe emotional distress; injury to reputation; past and future economic loss; and loss of future employment prospects.

**COUNT III**
**DEFAMATION**
(v. Penn State, Glon, Abashidze)

144.   All Paragraphs of this pleading are incorporated herein by reference.

145.   As previously alleged, Defendants Glon and Abashidze have widely and maliciously defamed Plaintiff Oldham with false statements to others, particularly in the small, insular competitive fencing community. They have disparaged her and portrayed Abashidze as the victim of a false report of sexual assault (despite repeated adjudications).

146.    By these maliciously false statements, Defendants Abashidze and Glon intended to destroy Oldham's reputation, standing, and employment prospects in the fencing world. Penn State was repeatedly informed of this conduct and did nothing to stop it. Defendants have thus harmed Oldham in her trade or profession, and have otherwise subjected her to ridicule, contempt, or disgrace. Accordingly, they are liable for defamation *per se.*

147.    Because as alleged previously, Penn State was aware of this conduct, enabled it, and did nothing to stop their employees from engaging in such defamation, specifically in their roles as Penn State Fencing Team personnel, Defendant Penn State is also liable on a *respondeat superior* basis.

148.    Defendants' actions and lack of action with regard to their defamation of Plaintiff have caused Oldham to sustain substantial injury, damage and loss, including but not limited to mental anguish; severe emotional distress; injury to reputation; past and future economic loss; and loss of future employment prospects.

## COUNT IV
## FAILURE TO TRAIN AND/OR SUPERVISE
## AGENTS AND/OR EMPLOYEES ON SEXUAL MISCONDUCT CLAIMS
(v. Penn State, Harris, and Glon)

149.    All Paragraphs of this pleading are incorporated herein by reference.

150.   At all relevant times, Glon and Harris were acting within the course and scope of their respective employment by Penn State University.

151.   Penn State has adopted a policy that requires it to establish procedures to train and supervise its employees so they comply with ~~to~~ its policies related to public safety and sexual misconduct, thereby creating Penn State's duty to conduct such training and supervision with reasonable skill and care.

152.   It is Penn State's policy that all Athletic Department employees are required to receive annual training on their responsibilities and duties under Policy AD85 and Title IX.

153.   Glon and/or Harris neglected their duty and failed to provide adequate annual sexual misconduct policy and Title IX training to all members of the Fencing Team's coaching staff.

154.   Defendants Glon and/or Harris neglected their duty and failed to ensure that all members of the Fencing Team's coaching staff were able and willing to comply with the spirit and letter of the University's policies and Title IX.

155.   Glon and/or Harris neglected their duty and failed to ensure that all members of the Fencing Team's coaching staff were complying with University policies and Title IX, even when confronted with Plaintiff's specific reports that they were not.

156.    Defendants' actions and lack of action with regard to their duty under their sexual misconduct prevention training and education policy caused Oldham to sustain substantial injury, damage and loss, including but not limited to mental anguish; severe emotional distress; injury to reputation; past and future economic loss; and loss of future employment prospects.

**COUNT V**
**BATTERY**
(v. Penn State and Abashidze)

157.    All Paragraphs of this pleading are incorporated herein by reference.

158.    On December 12, 2017, Abashidze intentionally caused direct bodily contact with Oldham's person without justification when he groped and kissed Oldham's arm, leg, and cheek, and grabbed her genitalia.

159.    Oldham did not consent to the contact.

160.    Abashidze was traveling on behalf of Penn State and therefore was, according to Penn State's travel policy TR02, acting as a representative of Penn State to the public. Applying the plain language of the University's policy TR02 implicates the doctrine of *respondeat superior* in this matter. Applying the plain language of the policy, Abashidze was acting as Penn State's public representative

and acting within the scope of his employment during the entirety of his trip, regardless of the particularities of his activity at any given moment.

161. In addition, Penn State effectively ratified Abashidze's criminal and tortious behavior, when it concluded after official investigations that Abashidze had not violated any Penn State policy.

162. Penn state, through the failure to train and/or supervise by Harris and Glon as complained of in Count IV, and as reflected by Harris' inability to classify Abashidze's conduct as a violation of any Penn State policy, effectively created a culture where Abashidze's failure to recognize his own conduct as a violation of University policy was not unreasonable, and therefore a negligent act with the responsibility for its consequences attributable to both Penn State and Abashidze.

163. For all these reasons, responsibility for the consequences of Abashidze's tortious and criminal sexual battery of Plaintiff is attributable to both Penn State and Abashidze.

164. As a direct and foreseeable result of Abashidze's offensive and unconsented bodily contact with Oldham, she has suffered, and will continue to suffer substantial injury, damage and loss, including but not limited to mental anguish; severe emotional distress; injury to reputation; past and future economic loss; and loss of future employment prospects.

## COUNT VI
## NEGLIGENCE/GROSS NEGLIGENCE
## PUNITIVE DAMAGES
## JOINT AND SEVERAL LIABILITY
(v. All Defendants)

165.    All Paragraphs of this pleading are incorporated herein by reference.

166.    The Defendants, and each of them, owed to the Plaintiff the duties to keep her safe from sexual assault and harassment by Abashidze while he was traveling and acting as a representative of Penn State to the community, and when they received her credible report of the sexual assault, to handle her claims properly and in good faith.

167.    Despite these duties, the Defendants breached their duties of reasonable care to the Plaintiff in all of the ways set forth in this Complaint, and in additional ways to be set forth and established at trial.

168.    The derogation of these duties by the Defendants, individually and collectively, were willful, wanton, and done with a reckless, conscious, and intentional disregard of the rights, health, well-being, and safety of the Plaintiff.

169.    Further, the Defendants, individually and collectively, knew or should have known that their derogation of those duties was likely to result in significant injury and harm to the Plaintiff.

170.   As a direct and proximate result of the negligence and/or gross negligence of the Defendants, individually and collectively, the Plaintiff has suffered substantial damage for which the Defendants, jointly and severally, should be required to pay as more specifically set forth herein.

171.   Based upon the conduct of the Defendants, which was, as alleged, willful and/or wanton, the Plaintiff is entitled to an award of punitive damages.

## COUNT VII
## NEGLIGENT/INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
## PUNITIVE DAMAGES
### (v. All Defendants)

172.   All Paragraphs of this pleading are incorporated herein by reference.

173.   The conduct of the Defendant Penn State, by and through the conduct, acts and/or omissions of the individual Defendants, was either intentional, negligent and/or grossly negligent as related to the Plaintiff.

174.   The acts and/or omissions of the individual Defendants were either intentional, negligent and/or grossly negligent as related to the Plaintiff herein.

175.   The actions and/or omissions of the Defendants were in furtherance of the financial interests of Penn State and were driven by, among other things, the financial greed and avarice of the University.

176.   The acts and/or omissions complained of in this Complaint arose out of a duty or duties that the Defendants, individually and collectively, had to Oldham to act in good faith, to deal with her claims with neutrality and a lack of bias, and to take Oldham's claims and rights under Title IX seriously.

177.   The acts and/or omissions constituted a breach of duty or duties owed to the Plaintiff by the Defendants, individually and collectively.

178. It was reasonably foreseeable to the Defendants that their conduct, actions, and/or omissions that constituted a breach of the duty or duties owed to Oldham would cause her severe emotional distress and/or damage.

179. The conduct, acts and/or omissions of the Defendants, individually and collectively, that constituted a breach of their duty or duties to the Plaintiff, did in fact cause severe emotional distress and/or damage to the Plaintiff.

180. Plaintiff has suffered, and continues to suffer, severe emotional and mental distress as a result of Defendants' conduct, including but not limited to: severe stress and anxiety, including anxiety for her own and her husband's careers

in fencing; anxiety regarding her livelihood as a fencing club owner; additional stress in managing the anxiety these events have caused her children to experience; loss of sleep; lack of concentration and inability to perform work tasks, due to the enormous distraction caused by these circumstances; feelings of intense grief at the loss of friendships, and feelings of betrayal by former friends, professional peers, and her primary coach-mentor; feelings of depression, despair, and humiliation.

181.   This severe emotional distress and/or damage suffered by the Plaintiff was directly and/or proximately caused by the negligent, grossly negligent, and/or intentional conduct, acts and/or omissions of the Defendants and/or each of them.

182.   The Plaintiff has been damaged as more specifically set forth herein and, due to the manner and character of the conduct, acts and/or omissions of the Defendants, and/or each of them, the Plaintiff is entitled to an award of punitive damages.

## PRAYER

WHEREFORE, Plaintiff respectfully requests judgment in her favor and against Defendants, jointly and severally, as follows:

183.   Compensatory damages for Plaintiff's psychological and emotional distress and damages, loss of standing in her professional community, damage to her business, career, and reputation, and her out-of-pocket expenses incurred in response

48

to these circumstances. These damages arise under the Title IX claims, as well as the separate causes of action which stem from state law which the Plaintiff prays the Court allow to be heard under its pendent jurisdiction;

184.    Punitive damages;

185.    Injunctive relief requiring Defendant University to take effective steps to eliminate discrimination and harassment in its programs and activities for all parties involved; to appropriately respond to all reported conduct that may constitute sexual harassment; to timely investigate reported conduct that may constitute sexual harassment or sexual assault; to mitigate the effects of any hostile environment that may arise from sexual harassment; to require proper training and administration of processing and investigating sexual misconduct allegations, proper hearing of complaints, and proper treatment of those subject to sexual misconduct by employees regardless of complainant's relationship with the University;

186.    Interest on the damages she is awarded;

187.    Costs;

188.    Reasonable attorney fees; and

189.    That all issues complained of herein be tried by a jury.

Respectfully submitted and filed this the 28th day of September, 2021.

KERSTIN WALKER SUTTON PLLC

*/s/ Kerstin Walker Sutton*
Kerstin Walker Sutton
3215 Deerchase Wynd
Durham, NC 27712-3020
(919) 886-6597
kws@kwsutton.com
NC State Bar No. 30008


*/s/ Stephen P. Lindsay*
Stephen P. Lindsay
Lindsay Law, PLLC
46 Haywood St., Suite 200
Asheville, NC 28701
(828) 551-6446
SPL@lindsaylaw.org
NC State Bar No.13017

Counsel for Plaintiff

## CERTIFICATE OF SERVICE

I certify that on September 28, 2021, I caused a true and correct copy of the foregoing First Amended Complaint to be served upon all Counsel of Record via the Court's ECF System.

/s/ *Kerstin W Sutton*

Kerstin W. Sutton, Esq.