## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JENNIFER OLDHAM,

        Plaintiff,

      v.

THE PENNSYLVANIA STATE
UNIVERSITY, *et al*.,

        Defendants.

No. 4:20-CV-02364

(Chief Judge Brann)

## MEMORANDUM OPINION

### MAY 13, 2022

Jennifer Oldham, a private fencing instructor based in North Carolina, was sexually assaulted by The Pennsylvania State University's fencing team assistant coach while the two were on a plane from Oregon to Illinois, the first leg of their respective return trips from a national fencing competition. Oldham notified Penn State's head fencing coach of the assault, but he dismissed her concerns and pressured her not to report the incident. The head coach refused to notify Penn State of the allegation, and then he and his assistant proceeded to spread falsehoods about Oldham and the assault to others in the small, insular competitive fencing community. Nevertheless, the assault was investigated and verified—first, by an independent body; second, by Penn State—and the assistant coach was ultimately banned from USA Fencing activities and fired by the University.

Oldham now brings suit against the Penn State fencing coaches as well as the University and its Title IX coordinator, alleging violations of Title IX of the Education Amendments of 1972 as well as various state law tort claims, including battery, defamation, negligent supervision/training, and negligent/intentional infliction of emotional distress. The Defendants move to dismiss the suit in full, arguing that Oldham's claims are both untimely and legally unsubstantiated. Although all but one claim qualify as timely, the lack of an established relationship with Penn State and absence of certain material allegations necessitate dismissal.

## I.    BACKGROUND

### A.    Factual Background

On December 12, 2017, members of Penn State's fencing team were on a commercial flight from Portland, Oregon to Chicago, Illinois, returning from a USA Fencing North America Cup tournament.[1] As Oldham describes it, Penn State fencing is "perennially an NCAA powerhouse and championship contender and trainer of Olympians."[2] And its head coach, Wieslaw Glon, is an institution unto himself—a coach at Penn State since 1985, Glon is the author of the program's success and deeply connected to, and highly regarded in, the small, insular, male-dominated competitive fencing community.[3] Although it is unclear whether Glon traveled with the Penn state fencers competing in the North America Cup

---

[1]    Doc. 105 ¶¶ 1, 6–7.
[2]    *Id*. ¶ 129.
[3]    *Id*. ¶¶ 14, 137–39.

tournament, his assistant coach, George Abashidze, attended the event and accompanied his team members on the return flight from Portland to Chicago.[4]

Jennifer Oldham, a private fencing instructor who operates a fencing club in Durham, North Carolina, was also on the flight.[5] She attended the North America Cup tournament as a coach for a fencer from her private club.[6] On the plane, Oldham had a middle seat in a standard three-seat row, with Abashidze to her left in the aisle seat.[7] Although not traveling together, the two were "generally acquainted."[8] To Oldham's right, in the window seat, sat another passenger returning from the fencing event whom Oldham also knew prior to the flight.[9]

Whatever expectations Oldham had of a cordial return trip with professional acquaintances proved misplaced. During the four-hour flight, "Abashidze made numerous lewd comments, touched Oldham's legs, arms, and face without her consent, and repeatedly demanded that Oldham have sex with him"—all "within earshot of nearby passengers."[10] And mid-flight, as the plane crossed "somewhere over the Great Plains region of the United States," Abashidze "thrust his hand between . . . Oldham's legs and grabbed her genitalia without her consent."[11]

---

[4]   *Id*. ¶ 6–7.
[5]   *Id*. ¶ 8.
[6]   *Id*.
[7]   *Id*. ¶¶ 1, 9.
[8]   *Id*. ¶ 10.
[9]   *Id*. ¶¶ 9–10.
[10]   *Id*. ¶ 2.
[11]   *Id*. ¶ 1.

Upon returning to North Carolina, Oldham shared the details of Abashidze's sexual assault with her husband.[12] She also sought advice from her professional mentor and former fencing coach, Ed Korfanty, a longtime friend of Glon's.[13] In January 2018, Korfanty called Glon and spoke with him about the assault.[14] Glon, in turn, spoke with Abashidze, and the two decided "Glon would not share information about Abashidze's misconduct with Penn State's Title IX Coordinator or anyone else in the Penn State Athletic Department."[15]

The following month, Penn State's fencing team competed in a tournament at Duke University in Durham, North Carolina—Oldham's hometown.[16] Glon and Abashidze traveled with the team to Durham, and Glon and Oldham arranged to meet.[17] During their meeting, Oldham detailed what Abashidze did to her on the plane and gave him a written summary of the assault.[18] She asked Glon if he was going to report Abashidze's assault to the Penn State Athletic Department, and he responded, "No."[19] Glon then attempted to convince Oldham not to report the incident to the United States Olympic and Paralympic Committee's SafeSport program—an independent, Congressionally created organization granted

---

[12]  *Id*. ¶ 38.
[13]  *Id*. ¶ 39.
[14]  *Id*. ¶ 40.
[15]  *Id*. ¶¶ 41–42.
[16]  *Id*. ¶¶ 8, 43.
[17]  *Id*. ¶¶ 43–44.
[18]  *Id*. ¶ 45.
[19]  *Id*. ¶¶ 46–47.

"exclusive authority to respond to sexual misconduct within the US Olympic and Paralympic Committee and each sport's National Governing Body"—by asserting that if the assault became known, it would ruin her reputation and no one would believe her.[20] Then, Glon brought Abashidze into the conversation with Oldham and directed him to apologize to her.[21]

Following this February 2018 encounter, unnamed individuals advised Oldham to report the sexual assault to SafeSport.[22] Indeed, the passenger seated to Oldham's right on the plane submitted a report to SafeSport detailing what he or she saw.[23] Nevertheless, Oldham was hesitant to do so herself, fearful of the negative professional and reputational consequences Glon mentioned.[24]

In April 2018, Oldham attended a USA Fencing North America Cup tournament in Richmond, Virginia.[25] Glon was also at the tournament, coaching members of the Penn State fencing team, as was Korfanty, Oldham's mentor and former coach.[26] Korfanty arranged for the three to meet.[27] Over coffee, Glon again pressured Oldham not to engage with SafeSport, asserting that Oldham "would not be believed if the story was uncovered or made public" and that "SafeSport would

---

[20]  *Id*. ¶¶ 48, 48 n.4.
[21]  *Id*. ¶ 50.
[22]  *Id*. ¶ 52.
[23]  *Id*. ¶ 51.
[24]  *Id*. ¶ 52.
[25]  *Id*. ¶ 54.
[26]  *Id*.
[27]  *Id*.

take no action against Abashidze."[28] Glon told Oldham that if she was questioned by SafeSport, she should refute the allegations filed by third-party witnesses.[29] He then stressed "what a 'good guy' Abashidze was," explaining how "the growing fallout from the assault was causing him anxiety, stress, and a loss of sleep."[30] Oldham, for her part, suggested to Glon that he had a duty to report the incident to Penn State.[31]

On June 30, 2018, Oldham's husband (acting without Oldham's knowledge) contacted Penn State's Athletic Director about the assault.[32] Penn State's Title IX Coordinator, Defendant Christopher Harris, and another official in the Penn State Athletic Department spoke with Oldham's husband by phone, explaining that his report of Oldham's allegations against Abashidze and Glon that day was "the first they heard of the situation."[33] Harris and others then organized a phone interview with Oldham on August 14, 2018, during which Oldham detailed Abashidze's assault and Glon's refusal to report it.[34] She asked Harris to investigate both Penn State employees, and, in response, he began an Affirmative Action Office ("AAO") investigation into matter.[35]

---

[28] *Id*. ¶¶ 55–56.
[29] *Id*.
[30] *Id*. ¶ 57.
[31] *Id*. ¶ 58.
[32] *Id*. ¶ 72.
[33] *Id*. ¶¶ 73–74.
[34] *Id*. ¶ 75.
[35] *Id*. ¶¶ 75–76.

Although Oldham did not hear from Harris between August 2018 and February 2019, the third-party allegations filed with SafeSport received considerable attention. Contrary to Glon's assertion that SafeSport "would take no action against Abashidze,"[36] the independent organization "investigated the allegations against Abashidze, found him to be responsible for the assault, and publicly suspended Abashidze from any association or involvement with USA Fencing sanctioned events and programs in 2018."[37] Abashidze appealed the suspension, and SafeSport convened an arbitration hearing to adjudicate the matter.[38] During the arbitration proceedings, which were held in December 2018, Abashidze, Glon, Oldham, and others testified.[39] Abashidze and Glon disputed Oldham's description of the assault, with both men labeling Oldham a "liar."[40] But, ultimately, the arbitration panel found Abashidze responsible for the assault and publicly suspended him from any involvement with USA Fencing for a year.[41]

During this time, Oldham experienced "harassment and retaliation through electronic media and in person at international competitions, which was instigated by Abashidze's and Glon's falsehoods shared with their friends and supporters in the fencing community and those who were doubters of the burgeoning

---

[36] *Id*. ¶ 56.
[37] *Id*. ¶ 60.
[38] *Id*. ¶ 61.
[39] *Id*. ¶¶ 61, 119.
[40] *Id*. ¶ 119.
[41] *Id*. ¶ 62.

international #metoo movement."[42] For example, Oldham heard colleagues "minimize and dismiss the assault because Abashidze did not 'present an immediate threat to minors'" and "merely 'brushed someone's arm on a plane.'"[43] As a result, Oldham "dramatically reduced her attendance at regional- and national-level fencing tournaments in the United States, international tournaments, games and events, workshops, and collegiate recruitment events."[44] Oldham "felt too uncomfortable to attend an invitational tournament held at Penn State the weekend of November 3, 2018.[45] Additionally, it is Oldham's belief that Penn State and other NCAA fencing programs headed by friends of Glon and Abashidze refused to recruit or offer fencing scholarships to any of her students.[46] This reduced the appeal of her fencing academy, leading "recruitable (college-bound) athletes" to leave her academy and instead join "a competing neighboring club."[47]

In January 2019, Oldham learned that Glon interfered with her application for a coaching position with the fencing program at the University of North Carolina-Chapel Hill ("UNC").[48] Glon personally called the UNC fencing team's

---

[42] *Id.* ¶ 78.
[43] *Id.* ¶ 108.
[44] *Id.*
[45] *Id.* ¶ 104. Oldham also highlights "an elite camp at Glon's friend Korfanty's club in Oregon" held in May 2019, from which she and several of her club's members were "abruptly dis-invited," *id.* ¶ 110, and the 2021 NCAA Fencing Championship, which was held at Penn State in March 2021 and "where one of Oldham's proteges competed for an individual championship and placed second." *Id.* ¶ 105.
[46] Doc. 105 ¶ 107.
[47] *Id.*
[48] *Id.* ¶ 106.

head coach "to see if he can do anything about Jennifer."[49] Around this time, Oldham also applied for but did not receive a coaching position at Northwestern University.[50]

The following month, Oldham contacted Penn State for an update on the AAO investigation.[51] Harris responded shortly after and emailed her a copy of the AAO Initial Determination, which "substantiated and admitted as true [Oldham's] factual allegations of the assault and harassment by Abashidze."[52] Despite this factual finding, the Initial Determination concluded that Abashidze had not violated any Penn State policy.[53] Additionally, it did not discuss Glon's failure to report Abashidze's assault.[54]

Oldham later received the AAO Final Determination, which "reached the same conclusions about Abashidze's assaultive behavior and the University policies," and likewise made no mention of Glon's "failure and refusal to report Oldham's sexual assault."[55] Although Penn State's Title IX policy requires the University to permit an alleged victim of sexual assault "to review and provide

---

[49]   *Id.*
[50]   *Id.*
[51]   *Id.* ¶ 80.
[52]   *Id.* ¶ 81.
[53]   *Id.* ¶ 82.
[54]   *Id.* ¶ 83.
[55]   *Id.* ¶¶ 86, 88.

comment or corrections" on an AAO Final Determination, Harris did not afford

Oldham this opportunity.[56]

That said, at some point in 2019 following Harris's investigation, Penn State

fired Abashidze, removing him from the fencing team coaching staff.[57] According

to Oldham, Penn State did so "only when it had no choice, because Abashidze's

public suspension from USA Fencing for sexual misconduct made him ineligible to

work as an NCAA Fencing coach at Penn State."[58]

### B.    Procedural History

Oldham filed her initial Complaint on May 27, 2020, in the United States

District Court for the Middle District of North Carolina.[59] The Defendants moved

to dismiss the claim for, among other things, lack of personal jurisdiction.[60] In the

alternative, Glon, Penn State, and Harris moved to transfer the case here, to the

United States District Court for the Middle District of Pennsylvania.[61]

On December 16, 2020, the Honorable Thomas D. Schroeder, Chief Judge

of the Middle District of North Carolina, granted the motions to transfer, thereby

rendering the motions to dismiss moot.[62] Chief Judge Schroeder reasoned that the

Middle District of Pennsylvania was "[a] more appropriate venue for Oldham's

---

[56] *Id.* ¶ 87.
[57] *Id.* ¶ 124.
[58] *Id.*
[59] Doc. 1.
[60] Doc. 22; Doc. 24; Doc. 31.
[61] Doc. 22; Doc. 24.
[62] Doc. 36 at 2.

claims" because it is where "all Defendants reside" and "the bulk of the witnesses to Oldham's sexual harassment and discrimination claims, as well as the witnesses who can testify as to Penn State's investigations into those claims, are located there."[63]

On October 26, 2021, Oldham filed her Amended Complaint, which asserted seven causes of action:

- <u>Count I</u> – violation of Title IX and civil conspiracy for deliberate indifference against all Defendants[64];

- <u>Count II</u> – violation of Title IX and civil conspiracy for retaliation / hostile work environment against all Defendants[65];

- <u>Count III</u> – defamation against Penn State, Glon, and Abashidze[66];

- <u>Count IV</u> – negligent failure to train and/or supervise its agents/employees on sexual misconduct claims against Penn State, Harris, and Glon[67];

- <u>Count V</u> – battery against Penn State and Abashidze[68];

- <u>Count VI</u> – negligence / gross negligence against all Defendants[69]; and

- <u>Count VII</u> – negligent/intentional infliction of emotional distress against all Defendants.[70]

---

[63]  *Id*. at 17–18.
[64]  Doc. 105 ¶¶ 113–34.
[65]  *Id*. ¶¶ 135–43.
[66]  *Id*. ¶¶ 144–48.
[67]  *Id*. ¶¶ 149–56.
[68]  *Id*. ¶¶ 157–64.
[69]  *Id*. ¶¶ 165–71.
[70]  *Id*. ¶¶ 172–82.

The Defendants moved to dismiss the Amended Complaint.[71] Those motions have been fully briefed and are now ripe for disposition.[72]

## II.    LAW

Under Federal Rule of Civil Procedure 12(b)(6), the Court dismisses a complaint, in whole or in part, if the plaintiff fails to "state a claim upon which relief can be granted." Following the landmark decisions of *Bell Atlantic Corp. v. Twombly*[73] and *Ashcroft v. Iqbal*,[74] "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[75] The United States Court of Appeals for the Third Circuit has instructed that "[u]nder the pleading regime established by *Twombly* and *Iqbal*, a court reviewing the sufficiency of a complaint must take three steps": (1) "take note of the elements the plaintiff must plead to state a claim"; (2) "identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth"; and (3) "assume the[] veracity" of all "well-pleaded factual allegations" and then "determine whether they plausibly give rise to an entitlement to relief."[76]

---

[71]  Doc. 106 (Penn State / Harris); Doc. 108 (Glon); Doc. 109 (Abashidze).

[72]  Abashidze: Doc. 117; Doc. 126; Doc. 131.
Glon: Doc. 115; Doc. 124; Doc. 134.
Penn State / Harris: Doc. 113; Doc. 125; Doc. 133.

[73]  550 U.S. 544 (2007).

[74]  556 U.S. 662 (2009).

[75]  *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570).

[76]  *Connelly v. Lane Construction Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (internal quotations and citations omitted).

## III.   ANALYSIS

In their motions to dismiss, the Defendants challenge the Amended Complaint on a series of independent procedural and substantive grounds. Given their respective legal interests and potential liabilities, Abashidze, Glon, and Penn State / Harris filed separate briefs with distinct legal arguments. That said, the Defendants generally address the same three issues: (a) choice of law; (b) statute of limitations; and (c) the merits of Oldham's seven causes of action. The Court does the same.

### A.   Choice of Law

The Defendants argue that Pennsylvania law (not North Carolina law) applies here for three reasons: (1) following a change of venue under 28 U.S.C. § 1406(a), the recipient district court must apply the law of the state where it sits[77]; (2) Pennsylvania's "Borrowing Statute" requires the application of "whichever [state law] first bars the claim"—here, Pennsylvania[78]; and (3) for the claims presenting a "true conflict," Pennsylvania has the greater interest.[79] In response, Oldham ignores the Defendants' arguments and instead asks the Court to adopt the rule of *lex loci delicti*—that is, to apply "the substantive law of the state where the

---

[77]  Doc. 113 at 5–6 (citing *Gerena v. Korb*, 617 F.3d 197, 204–05 (2d Cir. 2010)); *see also* Doc. 131 at 2 (citing *Panthera Rail Car LLC v. Kasgro Rail Corporation*, 985 F. Supp. 2d 677, 690 (W.D. Pa. 2013)).

[78]  Doc. 113 at 6–7 (citing 42 Pa. C.S. § 5521(b)); *see also* Doc. 134 at 10.

[79]  Doc. 113 at 8–12; Doc. 134 at 4–9.

injury is felt."[80] According to Oldham, because "materially all injury has been felt in [her] home state of North Carolina," North Carolina law should govern.[81] The merits of Oldham's position notwithstanding, the Court addresses each of the Defendants' arguments in turn.

### 1.    Change of Venue

First, the Defendants assert that consistent with the United States Court of Appeals for the Second Circuit's holding in *Gerena v. Korb*,[82] Pennsylvania law applies to all of Oldham's claims because following a transfer for change of venue under 28 U.S.C. § 1406(a), the recipient district court "logically applies the law of the state in which it sits."[83] But the Court reads this ruling differently.

In *Gerena*, the Second Circuit held that rather than automatically dictating the outcome of a choice-of-law analysis, a § 1406(a) transfer for change of venue simply requires the recipient district court to apply the choice-of-law rules of the state in which it sits.[84] The Second Circuit explained that if venue was improper in New York (i.e., the state in which that case was initially filed) under § 1406(a), "then the district court correctly applied Connecticut [i.e., the state of the recipient

---

[80]   Doc. 125 at 7.
[81]   *Id.*
[82]   617 F.3d 197, 204–05 (2d Cir. 2010).
[83]   Doc. 113 at 5; *see also* Doc. 131 at 2 ("In accordance with the decision in *Panthera*, [985 F. Supp. 2d at 690], since the reason for the transfer [to the Middle District of Pennsylvania] was jurisdictional, Pennsylvania law must be applied as the law of the forum state rather than the law of the transferring state of North Carolina.").
[84]   617 F.3d at 204–05.

district] choice of law and Connecticut procedure."[85] This understanding of *Gerena* accords with the rulings of the United States Court of Appeals for the Fifth Circuit in *National Union Fire Insurance Co. v. American Eurocopter Corp.*[86] and the United States Court of Appeals for the Sixth Circuit in *GBJ Corp. v. Eastern Ohio Paving Co.*[87]

Accordingly, the Second Circuit's holding in *Gerena* does not end the choice-of-law analysis; rather, it guides the Court on how to begin. Consistent with that decision, to determine which state's laws govern the underlying claims and their statutes of limitations, the Court must apply Pennsylvania's choice-of-law rules.

### 2.   Pennsylvania's Borrowing Statute

To that end, the Defendants next argue that on the discrete issue of whether to apply Pennsylvania's or North Carolina's statute of limitations' accrual rules— that is, distinct from the determination of which state's substantive law governs each cause of action—the Commonwealth's "borrowing statute" dictates that

---

[85]   *Id.* at 205 (because the transfer occurred under 28 U.S.C. § 1404(a), the Second Circuit held "it must be determined whether personal jurisdiction over [the defendant] existed in New York, such that New York choice of law should have governed the claims against him")

[86]   692 F.3d 405, 408 n.3 (5th Cir. 2012) ("The choice-of-law rules of the transferee state apply if a diversity suit was transferred from a district court that had no personal jurisdiction over the defendant or where venue was otherwise improper.").

[87]   139 F.3d 1080, 1084 (6th Cir. 1998) ("When a case is transferred" under 28 U.S.C. § 1406(a) because of improper venue and a lack of jurisdiction, "the choice-of-law rules of the tranfer*ee* court apply."); *see also Panthera*, 985 F. Supp. 2d at 690 ("Where a case is transferred from one federal court district to cure a jurisdictional defect—as is the case here—the transferee court applies the choice of law rules applicable in the forum state.").

Pennsylvania's statute of limitations applies to all of Oldham's claims.[88] The Court agrees.

Under Pennsylvania law, the choice between Pennsylvania's or another state's statute of limitations' accrual rules is not resolved by a conflict-of-law analysis.[89] Instead, Pennsylvania courts either apply the Commonwealth's statute of limitations, or, when the claim accrues in a foreign jurisdiction, look to the Commonwealth's "borrowing statute" for guidance.[90] This statute provides that "[t]he period of limitation applicable to a claim accruing outside this Commonwealth shall be either that provided or prescribed by the law of the place where the claim accrued or by the law of this Commonwealth, *whichever first bars the claim*."[91]

For the claims at issue here, the limitations periods prescribed by Pennsylvania law are equal to or shorter than their equivalents under North Carolina law:

---

[88]  Doc. 113 at 6–8; Doc. Doc. 134 at 10.

[89]  *See Hartz v. Diocese of Greensberg*, 94 F. App'x 52, 55 (3d Cir. 2004) (rejecting plaintiff's claim that district court "mistakenly refused to engage in a conflict-of-law analysis to potentially apply another state's statute of limitations' accrual rules" because under Pennsylvania's borrowing statute, "no conflict-of-law analysis was necessary, and the District Court correctly applied Pennsylvania's accrual rule").

[90]  *Stephens v. Clash*, 2014 WL 2808599, at *3 (M.D. Pa. June 19, 2014) (Connor, J.) (citing *Ross v. Johns-Manville Corp.*, 766 F.2d 823, 826 n.3 (3d Cir. 1985)).

[91]  42 Pa. C.S. § 5521(b) (emphasis added).

- <u>Counts I & II</u> (Title IX): Pennsylvania applies a two-year limitations period[92]; North Carolina applies a three-year limitations period.[93]

- <u>Count III</u> (Defamation): Pennsylvania's limitations period is one year[94]; North Carolina's limitations period is likewise one year.[95]

- <u>Count IV</u> (Negligent Supervision/Training): Pennsylvania applies a two-year limitations period[96]; North Carolina applies a three-year limitations period.[97]

- <u>Count V</u> (Battery): Pennsylvania's limitations period is two years[98]; North Carolina's limitations period is three years.[99]

- <u>Count VI</u> (Negligence): Pennsylvania's limitations period is two years[100]; North Carolina's limitations period is three years.[101]

---

[92] *See Kaseteleba v. Judge*, 325 F. App'x 153, 156 (3d Cir. 2009) (Because "[t]he period of limitations for a § 1983 action is governed by the forum state's statute for personal injury actions, . . . in Pennsylvania, the limitations period for a § 1983 action is two years").

[93] *See McClean v. Duke University*, 376 F. Supp. 3d 585, 597 (M.D.N.C. 2019) ("The statute of limitations for a Title IX claim is determined by reference to the state statute most closely analogous to Title IX, which is usually a personal injury cause of action," and "[i]n North Carolina, the statute of limitations for a personal injury claim is three years.") (citations omitted).

[94] 42 Pa. C.S. § 5523(1).

[95] N.C. Gen. Stat. § 1-54(3).

[96] *See Toy v. Metropolitan Life Insurance Co.*, 863 A.2d 1, 14 (Pa. Super. 2004) (holding that trial court did not "abuse[] its discretion" when is "dismissed [the plaintiff's] negligent supervision claim because [she] failed to raise the claim within the two-year statute of limitations").

[97] *See Foster v. Crandell*, 638 S.E.2d 526, 536 (N.C. App. 2007) (noting that claim for negligently failing to supervise is subject to a "three-year statute of limitations").

[98] 42 Pa. C.S. § 5524(1).

[99] N.C. Gen. Stat. § 1-52(16).

[100] 42 Pa. C.S. § 5524(2).

[101] N.C. Gen. Stat. § 1-52(16).

- <u>Count VII</u> (Negligent/Intentional Infliction of Emotional Distress): Pennsylvania applies a two-year limitations period[102]; North Carolina applies a three-year limitations period.[103]

Accordingly, the Court must apply Pennsylvania's statutes of limitations for all seven claims.

### 3.    Choice of Law Analysis

Finally, the Court must determine whether Pennsylvania or North Carolina law governs the *substance* of Oldham's claims. As discussed, the Court performs this analysis under Pennsylvania's choice of law rules,[104] which proceed in two steps: "Pennsylvania courts first consider whether a 'true conflict' exists between the two states," and, if yes, they must then determine "which state has the most significant relationship to the occurrence and the parties."[105]

### a.    True Conflict

A "true conflict" exists when (1) the states' laws are "actually incompatible," and (2) "both jurisdictions have a governmental policy or interest

---

[102] *See Quintana v. City of Philadelphia*, 2018 WL 3632144, at *9 (E.D. Pa. July 30, 2018) (holding that plaintiff's "claims for intentional and negligent infliction of emotional distress are barred by Pennsylvania's two-year statute of limitations").

[103] *See Dickens v. Puryear*, 276 S.E.2d 325, 330 n.8 (N.C. 1981) (holding that the tort of intentional infliction of emotional distress is "governed by the more general three-year statute of limitations") (citing N.C. Gen. Stat. § 1-52(5)).

[104] *Panthera*, 985 F. Supp. 2d at 690; *see also Melmark, Inc. v. Schutt*, 206 A.3d 1096, 1104 (Pa. 2019) ("Courts conduct a choice-of-law analysis under the choice-of-law rules in the forum state.").

[105] *Melmark*, 206 A.3d at 1104, 1107.

that would be impaired by the application of the other state's law."[106] The differing

states' laws are considered "actually incompatible" if there are "relevant

differences between [them] that would affect the disposition of the litigation."[107]

Absent relevant differences, "there is no conflict, and the court may refer to the

states' laws interchangeably."[108]

If there are relevant differences between the laws, the court must then

"examine the governmental policies underlying each law, and classify the conflict

as 'true,' 'false,' or an 'unprovided-for' situation."[109] Pennsylvania courts consider

a conflict "false" when only one state's interest "will be harmed if the Court does

not apply its law."[110] In that instance, "the law of the only interested jurisdiction

should be applied."[111] A conflict is considered "unprovided-for" when "no

jurisdiction's interests would be impaired if its laws were not applied."[112] For

unprovided-for tort cases, "courts use the *lex loci delicti*, or 'place of the wrong,'

rule and apply the law of the state where the harm occurred."[113]

---

[106] *Toll v. Tannenbaum*, 982 F. Supp. 2d 541, 549–50 (E.D. Pa. 2013), *aff'd*, 596 F. App'x 108 (3d Cir. 2014) (citing *Hammersmith v. TIG Insurance Co.*, 480 F.3d 220, 229–30 (3d Cir. 2007)).

[107] *Taylor v. Mooney Aircraft Corp.*, 265 F. App'x 87, 90 (3d Cir. 2007).

[108] *Id*. (citation omitted).

[109] *Hammersmith*, 480 F.3d at 230.

[110] *Id*. at 232.

[111] *Taylor*, 265 F. App'x at 95.

[112] *Budget Rent-A-Car System, Inc. v. Chappell*, 407 F.3d 166, 170 (3d Cir. 2005).

[113] *Miller v. Native Link Construction, LLC*, 2017 WL 3536175, at *10 (W.D. Pa. Aug. 17, 2017) (citing *Budget*, 407 F.3d at 170) (cleaned up).

The Defendants argue, and Oldham does not dispute, that Counts I & II (Title IX), III (defamation), V (battery), and VI (negligence) do not present a "true conflict" because the relevant Pennsylvania and North Carolina laws are wholly compatible—that is, the legal standards applied to these claims are indistinguishable.[114] However, the states' laws regarding negligent supervision (Count IV) and negligent/intentional infliction of emotion distress (Count VII) are "actually incompatible":

- Count IV (Negligent Supervision): Under Pennsylvania law, a plaintiff must show that her loss resulted from "(1) a failure to exercise ordinary care to prevent an intentional harm by an employee acting outside the scope of his employment, (2) that is committed on the employer's premises, (3) when the employer knows or has reason to know of the necessity and ability to control the employees."[115] But North Carolina does not require a plaintiff asserting negligent

---

[114] In her opposition to Glon's motion to dismiss, Oldham appears to question (without analysis) whether the states' laws on defamation are "actually incompatible." *See* Doc. 124 at 24 ("If Pennsylvania requires greater particularity for defamation allegations, then North Carolina law should govern."). But under Pennsylvania and North Carolina law, a claim for defamation includes the same elements: (1) "[t]he defamatory character of the communication"; (2) "[i]ts publication by the defendant"; (3) "[i]ts application to the plaintiff"; (4) "[t]he understanding by the recipient of its defamatory meaning"; and (5) "[t]he understanding by the recipient of it as intended to be applied to the plaintiff." *Graboff v. Colleran Firm*, 744 F.3d 128, 135 (3d Cir. 2014); *accord Desmond v. News & Observer Publishing Co.*, 772 S.E.2d 128, 135 (N.C. App. 2015)). Further, to establish that the allegedly defamatory statements were published to a third party, both states require a plaintiff to "identify specifically what allegedly defamatory statements were made, and to whom they were made." *Moses v. McWilliams*, 549 A.2d 950, 960 (Pa. Super. 1988); *accord Horne v. Cumberland County Hospital System, Inc.*, 746 S.E.2d 13, 20 (N.C. App. 2013) (noting that a complaint that "fails to identify the allegedly defamatory remarks made by [the defendant] or to specific when they were made," and holding that "[t]his lack of specificity is, by itself, a sufficient basis to support the dismissal of plaintiff's defamation claim").

[115] *Belmont v. MB Investment Partners*, 708 F.3d 470, 487–88 (3d Cir. 2013) (citing *Dempsey v. Walso Bureau, Inc.*, 246 A.2d 418, 420 (Pa. 1968)).

supervision to show that the injury occurred on the employer's premises.[116]

- Count VII (Negligent/Intentional Infliction of Emotional Distress): Under Pennsylvania law, a plaintiff must allege physical injury attendant to the emotional distress.[117] But North Carolina law does not require physical injury.[118]

Notwithstanding the relevant differences in the states' legal standards for these claims, the Defendants argue that no "true conflict" exists because North Carolina has not "articulated a legitimate interest" that would be harmed if the Court were to apply Pennsylvania's version of these laws.[119] The Court disagrees.

For the negligent supervision claim, the Defendants assert that Pennsylvania's "premises requirement" is "an indicator of, and consistent with, [the Commonwealth's] interest in safeguarding employers against liability for

---

[116] *Medlin v. Bass*, 398 S.E.2d 460, 462 (N.C. 1990) ("North Carolina recognizes a claim for negligent employment or retention when the plaintiff proves": (1) "the specific negligent act on which the action is founded"; (2) "incompetency, by inherent unfitness or previous specific acts of negligence, from which incompetency may be inferred"; (3) "either actual notice to the master of such unfitness or bad habits, or constructive notice, by showing that the master could have known the facts had he used ordinary care in 'oversight and supervision'"; and (4) "that he injury complained of resulted from the incompetency period.") (emphasis and citation omitted).

[117] *Armstrong v. Paoli Memorial Hospital*, 633 A.2d 605, 609 (Pa. Super. 1993) ("Physical injury must be averred to sustain an action for negligent infliction of emotional distress."); *Hart v. O'Malley*, 647 A.2d 542, 554 (Pa. Super. 1994) ("[I]t is clear that in Pennsylvania, in order to state a claim under which relief can be granted for the tort of intentional infliction of emotional distress, the plaintiffs must allege physical injury.").

[118] *See, e.g.*, *Dickens v. Puryear*, 276 S.E.2d at 332–33 ("If 'physical injury' means something more than emotional distress or damage to the nervous system, it is simply not an element of the tort of intentional infliction of emotional distress. As noted, plaintiff in Stanback never alleged that she had suffered any physical injury, yet we held that she had stated a claim for intentional infliction of mental distress.") (citing *Stanback v. Stanback*, 254 S.E.2d 611, 623 (N.C. 1979)).

[119] Doc. 133 at 6–8.

21

intentional torts committed by employees when those employees are not on the employer's premises."[120] Citing the ruling by the United State District Court for the Eastern District of Pennsylvania in *Manley v. Navmar Applied Sciences Corp.*, the Defendants argue that this "interest in protecting employers from liability has been considered by courts in this District when conducting a choice of law analysis."[121] Bizarrely, the Defendants then claim that "North Carolina has not stated a similar interest for negligent supervision claims."[122] The Defendants apparently misread the very case they cite.

In *Manley*, the court considered the competing laws governing negligent supervision claims in Arizona and Pennsylvania.[123] The court explained that Arizona requires a showing of "willful misconduct" for negligent supervision claims, but Pennsylvania "does not appear to have any similar bar to relief."[124] Although the court cited no evidence that either Pennsylvania's courts or legislature ever considered imposing a "willful misconduct" requirement for negligent supervision claims or expressly deemed such a requirement contrary to the Commonwealth's interests, the court nevertheless held that "there is a true

---

[120] Doc. 133 at 7.
[121] *Id*. at 7–8 (citing *Manley v. Navmar Applied Sciences Corp.*, 2013 WL 271818, at *6 (E.D. Pa. Jan. 24, 2013)).
[122] *Id*. at 8.
[123] 2013 WL 271818 at *5–6.
[124] *Id*.

conflict between" Pennsylvania and Arizona law because "both states would have an interest in applying their laws to the present suit."[125]

Applying that standard here, this Court concludes that both Pennsylvania and North Carolina have an interest in enforcing their laws on negligent supervision: Pennsylvania to shield employers from suits stemming from their employees' off-site actions; North Carolina to protect victims of tortious conduct by imposing liability on employers for a wider array of employee conduct. As in *Manley*, because a true conflict exists, this Court must then proceed to the second step of Pennsylvania's choice of law analysis and determine which state has a more significant interest to the events underlying, and parties involved in, the instant action.[126]

For the infliction of emotional distress claims, the Defendants again argue that whereas Pennsylvania has "a legitimate interest" in enforcing its infliction of emotional distress laws—which require allegations and proof of physical injury— "North Carolina has not."[127] But, again, the Court disagrees. The Supreme Court of Pennsylvania traces the denial of recovery for purely "psychic injury"—that is, an injury with no physical manifestations—"to three principal concerns: medical science's difficulty in proving causation, the danger of fraudulent or exaggerated

---

[125]  *Id.*
[126]  *Id.* at *6.
[127]  Doc. 133 at 7.

claims, and the perception that recognition of such a cause of action would precipitate a flood of litigation."[128]

The Supreme Court of North Carolina has likewise directly confronted this issue. In *Dickens v. Puryear*, the North Carolina Supreme Court exhaustively analyzed its relevant precedents on the matter and explicitly declined to impose a "physical injury" requirement for IIED claims.[129] The North Carolina Supreme Court considered concerns about foreseeability, causation, and proof (i.e., the same issues identified by its Pennsylvania counterpart) but nevertheless deemed the showing of physical injury unjustified.[130] Given the depth of the North Carolina Supreme Court's analysis and seriousness with which it considered this issue, the Court cannot accept the Defendants' assertion that "only Pennsylvania's interest would be impaired by application of the law of the other state."[131] Accordingly, a "true conflict" exists as to this Count as well.

> **b.    Significant Relationship**

Because a "true conflict" exists between the relevant Pennsylvania and North Carolina laws, the Court must "assess[], under choice-of-law principles, . . . which state's law should be applied to the facts of the case."[132] For this, "[s]tates formerly applied the *lex loci delicti*, or 'place of injury,' rule, under which the law

---

[128] *Kazatsky v. King David Memorial Park, Inc.*, 527 A.2d 988, 992 (Pa. 1987).
[129] 276 S.E.2d at 330–35.
[130] *Id.*
[131] Doc. 133 at 7.
[132] *Melmark*, 206 A.3d at 1105.

of the state where the injury occurred would be applied"[133]—that is, the choice-of-law rule Oldham asks the Court to apply here.[134] But as the Supreme Court of Pennsylvania explained in *Melmark, Inc. v. Schutt*, "Pennsylvania, like a majority of other states, has abandoned this rule."[135] Instead, Pennsylvania courts "apply the law of the state having the most significant contacts or relationships with the particular issue."[136] For tort cases, the relevant contacts "are enumerated in Restatement (Second) of Conflict of Laws § 145(2)(a)–(d), and include: '(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered.'"[137]

First, as Oldham explains, because she lives and operates her fencing club in North Carolina, the injury has primarily "been felt" in North Carolina.[138] That said, the location where Oldham's alleged injuries *occurred* varies. The alleged assault took place on an airplane traveling from Oregon to Chicago—in neither Pennsylvania nor North Carolina.[139] Further, Oldham alleges that she was

---

[133] *Id.* at 1107.
[134] Doc. 125 at 7.
[135] 206 A.3d at 1107.
[136] *Taylor*, 265 F. App'x at 91 (internal quotation marks and citation omitted); *see also Griffith v. United Air Lines, Inc.*, 203 A.2d 796, 805 (Pa. 1964) (abandoning the *lex loci delicti* rule "in favor of a more flexible rule which permits analysis of the policies and interest underlying the particular issue before the court").
[137] *Taylor*, 265 F. App'x at 91 n.4.
[138] Doc. 125 at 9.
[139] Doc. 105 ¶¶ 1, 6.

"subjected to a hostile environment in Penn State programs and activities,"
including, most notably, "the NCAA Championship held at Penn State in March
2021, where one of Oldham's proteges competed for an individual championship
and placed second."[140] To the extent Oldham suffered injuries in relation to these
Penn State programs and events, the injuries—like the events themselves—
occurred in Pennsylvania. Accordingly, the Court agrees with the Defendants that
this factor is not dispositive.[141]

Second, and most important to this Court's analysis, is the place where the
conduct causing the injuries occurred. For this, the Court finds particularly
instructive Chief Judge Schroeder's analysis supporting his decision to transfer the
instant case from the Middle District of North Carolina to the Middle District of
Pennsylvania:

> At the center of all of Oldham's claims is the assault
> allegedly perpetrated by Abashidze and the failure of the
> responsible officials to properly act on Oldham's reports.
> In relation to these claims, the vast majority of
> underlying events did not occur in the Middle District of
> North Carolina. Rather, with the exception of the assault
> itself (which was perpetrated mid-flight over the Great
> Plains region), the substantial events alleged in this case
> occurred in Centre County, Pennsylvania, in the Middle
> District of Pennsylvania. For example, Glon's initial
> failure to report Oldham's assault became actionable
> following his January 2018 phone call with Korfanty. At
> the time, Glon was in the Pennsylvania district. Similarly,
> the alleged conspiracy to cover-up the assault was

---

[140] *Id.* ¶¶ 101, 104–05.

[141] *See* Doc. 134 at 6 ("[T]he location of [Oldham's] alleged injuries varies and is not dispositive to this Court's analysis.").

> formed between Glon and Abashidze in that district. All
> of Penn State's investigations into Oldham's assault were
> conducted in Pennsylvania, and all of the related reports
> were produced there. Likewise, all of [the] Defendants'
> alleged failures to sufficiently train coaching staff in Title
> IX procedures occurred in the Pennsylvania district.[142]

For these reasons, the second factor weighs heavily in favor of Pennsylvania.

The third factor, concerning the domicile of the parties, is a wash. Oldham

lives and operates her fencing club in North Carolina.[143] But at all relevant times,

the individual Defendants lived and worked in Centre County, Pennsylvania, and

Penn State is (obviously) a Pennsylvania institution.[144]

The final factor (i.e., the place where the relationship is centered) weighs in

Pennsylvania's favor. Oldham's relationship with Penn State (and, therefore,

Harris) is predicated on her and her clients' attendance at Penn State fencing

programs, events, and activities as well as her clients' admission to, and

membership on the fencing team of, Penn State.[145] To the extent Oldham

previously held or maintains any direct relationship with Glon, that appears to

relate solely to Glon's position as the head coach of Penn State's fencing team.[146]

And for Abashidze, Oldham alleges that the two were "generally acquainted," but

she provides no further details on where that relationship was "centered."[147]

---

[142] Doc. 36 at 14–15 (internal citations omitted).
[143] Doc. 105 ¶ 11.
[144] *Id*. ¶¶ 12–15.
[145] *See id*. ¶¶ 104–05, 111.
[146] *See, e.g., id*. ¶¶ 38–59.
[147] *Id*. ¶ 10.

Taken together, these factors establish that Pennsylvania has a more significant relationship with the parties and the events at issue than North Carolina. As such, Pennsylvania law applies.

### B.     Statute of Limitations

The Defendants next move to dismiss all of Oldham's claims as untimely under the applicable statutes of limitations.[148] Given the differing limitations periods for, and underlying facts relevant to, each claim, the Court considers each cause of action in turn.

### 1.     Title IX Claims (Counts I & II)

As explained, in Pennsylvania, the limitations period for Title IX claims is two years.[149] Because Oldham filed her original Complaint on May 27, 2020, the Title IX claims qualify as timely so long as the underlying tortious conduct occurred after May 27, 2018.

The Defendants argue that Oldham's Title IX claims are predicated on "three discrete events" that all "occurred more than two years before Oldham filed her Complaint on May 27, 2020."[150] Specifically, the Defendants focus on the following: (1) December 12, 2017 – the alleged assault[151]; (2) February 2018 – the conversation between Glon, Abashidze, and Oldham at a Duke University fencing

---

[148] *See* Doc. 113 at 12–15; Doc. 115 at 15–17, 22–23, 31–32; Doc. 117 at 6–13.
[149] *See Kaseteleba*, 325 F. App'x at 156.
[150] Doc. 113 at 12 (emphasis omitted).
[151] Doc. 105 ¶ 1.

tournament when Glon told Oldham he would not report Abashidze's assault to Penn State and "attempted to manipulate and/or intimidate [her] by using his stature in the sport and at Penn State to convince her not to report the incident"[152]; and (3) April 2018 – Glon's efforts at a fencing tournament in Virginia to "pressure[] Oldham not to engage with SafeSport and, if she was questioned by them, to refute the allegations filed by the third-party witness."[153] But that's not quite right.

For Count I (deliberate indifference), Oldham bases her claim against Abashidze and Glon on the men's "attempt to keep Oldham from reporting the assault" as well as their later efforts "to foster a general belief that she was not credible and should not be believed."[154] The Defendants are correct that a claim related solely to the former accrued prior to May 27, 2018: Oldham "knew or should have known" that Abashidze and Glon were attempting to stop her from reporting the assault by no later than February 2018.[155] However, the second predicate (i.e., the alleged defamation campaign), concerns actions by Abashidze and Glon that Oldham alleges occurred "[d]uring [a] six-month period" between

---

[152] *Id*. ¶¶ 43–50, 118.

[153] *Id*. ¶¶ 54–59, 118; *see also* Doc. 115 at 16 ("As Defendant Glon's purported actions in January, February, and April 2018 occurred more than two years before [Oldham] filed suit, they fall outside Title IX's statute of limitations."); Doc. 117 at 6 ("[Oldham] indicates no such specific actions were committed by Abashidze, let alone any tortious actions, after February 2018.").

[154] Doc. 105 ¶ 119.

[155] *D.D. v. Stockton University*, 2019 WL 3369709, at *6 (D.N.J. July 26, 2019); *see also* Doc. 36 at 15 ("Glon's initial failure to report Oldham's assault became actionable following his January 2018 phone call with Korfanty.").

"August 2018 and February 2019."[156] That conduct falls squarely within the limitations period. Although Oldham characterizes these efforts as components of an "ongoing conspiracy" to "delay or avert potential consequences for Abashidze," because the predicates arguably constitute independent bases for this Title IX claim, the Court declines to dismiss as untimely Count I as to Abashidze and Glon.

Similarly, the factual predicate to Count I as to Penn State and Harris occurred within the limitations period. Oldham asserts that this claim did not accrue prior to May 27, 2018, because Harris and other officials in the Penn State Athletic Department did not learn about Abashidze's sexual assault until Oldham's husband reported the incident on June 30, 2018, and Oldham "first became aware of Abashidze and Glon's defamatory campaign . . . in the latter half of 2018."[157] In response, Penn State points to Oldham's allegations that Glon refused to report the assault to the Penn State and efforts to dissuade her from filing a report with SafeSport and argues that "[b]ased on these allegations, a reasonable person in Oldham's position would have known as early as January 2018, but certainly by no later than April 2018, that [Penn State and Harris] were not addressing her allegations in a manner she deemed satisfactory."[158]

---

[156] Doc. 105 ¶¶ 77–78.
[157] Doc. 125 at 11–12 (citing Doc. 105 ¶¶ 72–76, 78).
[158] Doc. 133 at 11 (citing Doc. 105 ¶¶ 40, 43–48, 55–56, 117).

The Court finds this argument unpersuasive. Deliberate indifference, by definition, requires actual knowledge.[159] Given that Glon allegedly told Oldham that he would not report Abashidze's assault to the Penn State Athletic Department and Harris allegedly informed Oldham that he had no knowledge of the incident until Oldham's husband contacted the University's Athletic Director in June 2018, it is incorrect to claim that a "reasonable person" would have known that Penn State and Harris were acting in a deliberately indifferent fashion prior to that June. As with Abashidze and Glon, the Court declines to dismiss Count I as to Penn State and Harris on this basis.

For Count II (retaliation / hostile work environment), the result is the same. Oldham alleges that Abashidze and Glon "systematically retaliated against [her] for her cooperation with the SafeSport tribunal that eventuated in Abashidze's adjudication, suspension from USA Fencing, and eventual dismissal from his position at Penn State."[160] Importantly, the Amended Complaint specifies when Oldham first learned about this allegedly tortious conduct: "[Oldham] first became aware of the Defendants' calumnies when she was told of Glon's interference with her application for employment at the University of North Carolina in the latter

---

[159] *See Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 648 (1999) (holding that funding recipients are deliberately indifferent "only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of *known circumstances*") (emphasis added).

[160] *Id*. ¶ 136.

half of 2018, after the SafeSport inquiry commenced."[161] This allegedly retaliatory conduct likewise serves as the factual predicate to Count II as to Penn State and Harris,[162] and as with Count I, Oldham alleges that her husband "first informed Harris and [other senior officials in the Penn State Athletic Department] of the Defendants' threats and harassment in July 2018."[163] Accordingly, for all four Defendants, this Count first became actionable no earlier than July 2018 and is therefore timely.

### 2.    Defamation (Count III)

With a one-year limitations period,[164] Oldham's defamation claim qualifies as timely only if the relevant statement was published to a third party after May 27, 2019. Notably, "[i]n Pennsylvania, each publication of [a defamatory statement] gives rise to an independent cause of action."[165]

The Defendants argue that the Amended Complaint fails to identify any defamatory statements against Oldham within a year of her initial Complaint. Specifically, Penn State and Harris argue that Oldham alleges "only a single alleged defamatory utterance by Glon and/or Abashidze," which occurred during the SafeSport arbitration proceeding in November 2018—more than a year before

---

[161] *Id*. ¶ 138.
[162] *Id*. ¶ 140 ("Penn State and Harris were repeatedly informed of these behaviors and allowed them to continue unchecked.").
[163] *Id*.
[164] 42 Pa. C.S. § 5523(1).
[165] *Cogley v. Duncan*, 32 A.3d 1288, 1290 n.5 (Pa. Super. 2011) (citing *Graham v. Today's Spirit*, 468 A.2d 454, 457 (1983))**.**

she filed her initial Complaint in May 2020.[166] For his part, Glon asserts that even if the Court credits Oldham's claims of Abashidze and Glon's "purported defamatory campaign"—thereby expanding the scope of relevant statements beyond Glon's and Abashidze's November 2018 testimony—Oldham has admitted that these efforts "concluded in April 2019."[167]

Oldham responds that the defamation action is timely because "the alleged facts indicate that Abashidze and Glon continued their campaign against Oldham well into the second half of 2019 and beyond."[168] According to Oldham, based on her treatment at various fencing events and inability to land a collegiate fencing coaching position, "the only reasonable inference is that [Abashidze's and Glon's] defamatory statements to fencing colleagues would have continued into the second half of 2019, and likely to the present day."[169]

But on this claim, Oldham has dug herself a hole from which she cannot escape. Even if the Court agreed with Oldham that her allegations demonstrate that Abashidze and Glon continued to make defamatory statements "into the second half of 2019 and beyond," the greater issue is the lack of specificity about these purported statements. As the Court addresses more fully below, the problem here is not that Oldham properly alleges a claim for defamation predicated solely on

[166] Doc. 113 at 13 (citing Doc. 105 ¶ 110).
[167] Doc. 115 at 22–23 (citing Doc. 105 ¶¶ 119–20).
[168] Doc. 124 at 13 (cleaned up) (citing Doc. 105 ¶¶ 106, 137–39, 145–46).
[169] *Id*. at 24.

33

statements that occurred outside the limitations period; the problem is that Oldham does not properly allege a claim for defamation.

### 3.    Failure to Train/Supervise (Count IV)

Under Pennsylvania law, negligent supervision and training claims are subject to a two-year statute of limitations.[170] Therefore, as with the Title IX claims, these claims are timely only if the underlying tortious conduct occurred after May 27, 2018.

The Defendants argue that Oldham's negligent supervision and training claims are "predicated either on [Penn State, Harris, and Glon's] alleged failure to supervise or train Abashidze before the alleged assault *or* [Penn State and Harris's] alleged failure to train Glon with respect to reporting Oldham's allegation," and, accordingly, the accrual date is either December 12, 2017 (the date of the alleged assault) or February 2018 (the month of Oldham's alleged meeting with Glon).[171] Oldham responds that the Defendants impermissibly narrow the scope of tortious conduct—ignoring the alleged retaliatory actions by Abashidze and Glon—and that by considering the relevant underlying conduct collectively, these claims qualify as timely under the continuing tort doctrine.[172] On this, the Court agrees with Oldham—at least, in part.

---

[170]   *Toy*, 863 A.2d at 14.
[171]   Doc. 113 at 14 (citing Doc. 105 ¶¶ 1, 43–44).
[172]   Doc. 125 at 14–17.

Although courts disagree about how to categorize the "continuing tort doctrine,"[173] its function and application are well established: "when a defendant's conduct is part of a continuing practice, an action is timely so long as the last act evidencing the continuing practice falls within the limitations period."[174] For claims based on continuing tortious conduct, "the plaintiff is only barred from recovering those damages that were ascertainable prior to the statutory period preceding the lawsuit."[175] That said, "[d]iscrete acts" that constitute "separate actionable [offenses]" do not implicate the continuing tort doctrine.[176]

For Count IV, Oldham alleges that Penn State, Harris, and Glon "neglected their duty and failed" to (a) "provide adequate annual sexual misconduct policy and Title IX training to all members of the Fencing Team's coaching staff," (b) "ensure that all members of the Fencing Team's coaching staff were able and willing to comply with the spirit and letter of the University's policies and Title IX," and (c) "ensure that all members of the Fencing Team's coaching staff were complying with University policies and Title IX, even when confronted with

---

[173] *Compare Cowell v. Palmer Twp.*, 263 F.3d 286, 292 (3d Cir. 2001) ("The continuing violations doctrine is an equitable exception to the timely filing requirement.") (internal quotation marks and citation omitted), *with Kowalski v. TOA PA V, L.P.*, 206 A.3d 1148, 1168 (Pa. Super. 2019) (explaining that properly understood, "the 'continuing tort doctrine' is not a separate doctrine, or an exception to the statute of limitations, as much as it is a straightforward application of the statute of limitations").

[174] *Cowell*, 263 F.3d at 292; *see also Kowalski*, 206 A.3d at 1168 ("[W]hen there are continuing or repeated wrongs that are capable of being terminated, a claim accrues every day the wrong continues or each time it is repeated.").

[175] *Kowalski*, 206 A.3d at 1168.

[176] *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002).

[Oldham's] specific reports that they were not."[177] The relevant "administrative policy addressing discriminatory acts pursuant to Title IX" (i.e., "AD85 Sexual and/or Gender-Based Misconduct and Harassment") prohibits sexual harassment and requires "Responsible Employee[s]" to "report incidents of possible Prohibited Conduct to the Title IX Coordinator."[178] The University's "sexual misconduct policies" prohibit, among other things, "retaliation" against individuals involved in "reporting, investigat[ing], or resol[ving]" alleged sexual misconduct violations.[179]

As this Court understands it, according to Oldham, the alleged failure to train and supervise the Penn State fencing team coaching staff on these policies resulted in Abashidze sexually assaulting her, Glon's failure to report the incident, and Abashidze and Glon's retaliatory defamation campaign against her. Under this theory for liability, Oldham's negligent supervision and training claims fall within the continuing tort doctrine—but only concerning Abashidze and Glon's retaliatory actions.

As a preliminary matter, the Court finds that the assault, the failure to report, and the retaliatory campaign constitute discrete actionable offenses that must be considered independently.[180] To that end, the sexual assault does not implicate the continuing tort doctrine. As the Defendants argue, this was a single occurrence—

---

[177] Doc. 105 ¶¶ 153–55.
[178] *Id*. ¶¶ 33–34.
[179] *Id*. ¶ 37.
[180] *See National R.R.*, 536 U.S. at 114.

Oldham does not allege that Abashidze assaulted her repeatedly over an extended period.[181] Accordingly, Oldham's claims based on the assault became actionable the day of the incident, December 12, 2017, well outside of the limitations period for Count IV.

Additionally, Glon's failure to report likewise falls outside the parameters of the continuing tort doctrine. The Court agrees with the Defendants that to the extent Count IV is predicated on Glon's refusal to notify the Penn State Athletic Department of Oldham's allegation, the claims accrued when Oldham first informed Glon of the assault in February 2018.[182]

But the alleged retaliatory campaign qualifies as continuing tortious conduct that extended into the limitations period. As discussed, Oldham alleges that she "first became aware of Abashidze and Glon's defamatory campaign . . . in the latter half of 2018."[183] Further, Oldham asserts that this "campaign" continued into 2019: "[i]n January 2019, Oldham was told that Glon had retaliated against her by interfering with her job prospects at UNC, when he called the UNC Fencing Head Coach 'to see if he can do anything about [Oldham].'"[184] Because this "defamatory campaign" included retaliatory conduct within two years of her original Complaint, Oldham's negligent supervision and training claims are timely.

---

[181] *See* Doc. 113 at 13–14.
[182] *Id*.; *see also* Doc. 36 at 15 ("Glon's initial failure to report Oldham's assault became actionable following his January 2018 phone call with Korfanty.").
[183] Doc. 125 at 11–12 (citing Doc. 105 ¶¶ 72–76, 78).
[184] Doc. 105 ¶ 106.

### 4. Battery (Count V)

For Oldham's battery claim, the statute of limitations is again two years.[185] The Defendants assert that the "[t]he alleged assault by Abashidze . . . forms the basis of Oldham's battery claim," and because the assault occurred more than two years before Oldham filed the initial Complaint, the battery claim is barred by the applicable statute of limitations.[186] Oldham concedes that the assault occurred outside the relevant limitations period, but argues the battery claim should nevertheless proceed because it is subject to equitable tolling.[187] Oldham is mistaken.

As the Third Circuit explained in *Oshiver v. Levin, Fishbein, Sedran & Berman*, "[e]quitable tolling functions to stop the statute of limitations where the claim's accrual date has already passed."[188] Federal courts recognize "three principal, though not exclusive, situations in which equitable tolling may be appropriate":

> (1) where the defendant has actively misled the plaintiff respecting the plaintiff's cause of action; (2) where the plaintiff in some extraordinary way has been prevented from asserting his or her rights; or (3) where the plaintiff has timely asserted his or her rights mistakenly in the wrong forum.[189]

---

[185] 42 Pa. C.S. § 5524(1).

[186] Doc. 113 at 15 (citing 42 Pa. C.S. § 5524(1)–(2)).

[187] Doc. 125 at 14–17.

[188] 38 F.3d 1380, 1387 (3d Cir. 1994), *overruled on other grounds by Rotkiske v. Klemm*, 890 F.3d 422, 428 (3d Cir. 2018) *(*en banc).

[189] *Id.*

But Pennsylvania has adopted a more restrictive standard for equitably tolling its statute of limitations: "[i]n Pennsylvania, judicial extensions of the statute of limitations are expressly forbidden absent fraud or its equivalent."[190] Accordingly, for Pennsylvania state law claims, plaintiffs cannot avail themselves of the second or third bases for equitable tolling included in the "more lenient federal standard" (i.e., extraordinary circumstances and mistakenly filing in the wrong forum)— fraud or its equivalent is required.[191]

Here, Oldham does not argue that she was prevented from filing her state law claims in a timely fashion because of the Defendants' fraudulent or deceptive conduct. Instead, she asserts that her state law claims are subject to equitable tolling because she "timely assert[ed] [her] rights but in the wrong forum."[192] According to Oldham, "all claims were timely filed under North Carolina law, which [she] had every reasonable expectation would govern."[193]

These circumstances may warrant equitable tolling under the "more lenient" federal standard; they do not, however, support equitable relief under Pennsylvania

---

[190] *Poole v. Marks*, 441 F. App'x 854, 857 (3d Cir. 2011) (citing 42 Pa. C.S. § 5504(a); *Aivazoglou v. Drever Furnaces*, 613 A.2d 595, 598 (Pa. Super. 1992)).

[191] *Id.*; *see also Oetting v. Heffler, Radetich & Saitta, LLP*, 2017 WL 3453342, at *6 n.4 (E.D. Pa. Aug. 11, 2017) (distinguishing Pennsylvania equitable tolling standard—prohibiting "judicial extension of the statute of limitations . . . absent fraud or its equivalent"—and "the more lenient federal standard," which "permits equitable tolling of federal claims where the plaintiff asserts her claims in a timely manner but has done so in the wrong forum," and explaining that the restrictive Pennsylvania standard applies "to equitable tolling of state law claims") (internal quotation marks and citations omitted).

[192] Doc. 125 at 16 (citing *Quest Diagnostics Venture, LLC v. Pennsylvania*, 119 A.3d 406, 413 n.6 (Pa. Cmwlth. 2015)).

[193] *Id.*

law.[194] Because Oldham's untimely filing was not attributable to fraud or its equivalent, equitable tolling does not save her battery claim (or her other state law claims). Count V is therefore dismissed with prejudice.

### 5.   Negligence / Gross Negligence (Count VI)

As with Oldham's negligent supervision and training claims (Count IV), the negligence / gross negligence claim (Count VI) is subject to a two-year statute of limitations,[195] and is therefore timely only if the underlying tortious conduct occurred after May 27, 2018. Although the conduct relevant to Abashidze's and Glon's purported breach of duty occurred before May 2018, the allegations specific to Penn State and Harris include actions within the two-year limitations period. Accordingly, the claim is dismissed as to Abashidze and Glon, but under the continuing tort doctrine, the claim as to Penn State and Harris is timely.

---

[194] Arguing that Pennsylvania courts have held that "[a]n untimely filed claim may be permitted under equitable tolling where . . . the plaintiff asserts rights but in the wrong forum," Oldham appropriately cites the Commonwealth Court of Pennsylvania's decision in *Quest Diagnostics Venture, LLC v. Pennsylvania*. 119 A.3d at 413 n.6. But this Court questions the validity of the legal standard detailed in *Quest Diagnostics*. In endorsing the broader, more lenient federal standard, the Commonwealth Court in *Quest Diagnostics* cites only its prior ruling in *Uber v. Slippery Rock University of Pennsylvania*. *Id.* (citing 887 A.2d 362, 366 (Pa. Cmwlth. 2015)). But that opinion, in turn, cites only the Third Circuit's ruling in *Oshiver*—that is, the federal case establishing the more lenient federal standard. *Uber*, 887 A.2d at 366 (citing *Oshiver*, 38 F.3d at 1387). The Commonwealth Court makes no mention of the contradictory Pennsylvania statute, 42 Pa. C.S. § 5504(a), or the relevant Pennsylvania Superior Court rulings affirming the Commonwealth's more restrictive standard. *See, e.g.*, *Aivazoglou*, 613 A.2d at 598. In resolving the contradicting state court precedents, this Court will defer to the rule promulgated by the Pennsylvania Superior Court, as recognized by the Third Circuit in *Poole*. 441 F. App'x at 857.

[195] 42 Pa. C.S. § 5524(2).

In the Amended Complaint, Oldham predicates her negligence / gross negligence claim on two legal duties the Defendants purportedly owed her: (1) the duty "to keep her safe from sexual assault and harassment by Abashidze while he was traveling and acting as a representative of Penn State to the community"; and (2) the duty "to handle her claims [of sexual assault] properly and in good faith."[196] The first alleged duty relates solely to the December 2017 assault.[197] But, as discussed, this event occurred outside the two-year limitations period and neither the continuing tort doctrine nor equitable tolling applies. Therefore, to the extent this claim is based on the first duty, it is dismissed as untimely.

The second alleged duty concerns the Defendants' obligations, after receiving Oldham's "credible report of the sexual assault," to "handle her claims properly and in good faith"—that is, as the Court understands it, to report, investigate, and impose appropriate sanctions based on Oldham's allegations of sexual assault.[198] It is unclear how this duty applies to Abashidze. Indeed, in the Court's estimation, it does not. For Glon, this duty is limited to his refusal to notify the Penn State Athletic Department of Oldham's allegation. But, as discussed, any claims predicated solely on Glon's failure to report accrued when Oldham first informed Glon of the assault in February 2018. Accordingly, this duty cannot serve

---

[196]  Doc. 105 ¶ 166.
[197]  *Id.*
[198]  *Id.*

as a valid basis for a negligence claim against either Abashidze or Glon. Count VI as to Abashidze and Glon is therefore dismissed with prejudice.

However, that is not the case for Penn State and Harris. Senior officials in the University's Athletic Department and Harris first learned of the alleged assault in June 2018, after Oldham's husband emailed Penn State's Athletic Director.[199] Harris launched the University's investigation into Oldham's allegations (i.e., the conduct relevant to the second alleged duty) in August 2018 and reached a final determination in April 2019.[200] Under the continuing tort doctrine, Penn State and Harris's investigative efforts qualify as a "continuing practice," and as relevant events occurred within the limitations period, the negligence / gross negligence claim as to these Defendants is timely.[201]

### 6. Negligent/Intentional Infliction of Emotional Distress (Count VII)

For Count VII, Oldham broadly incorporates the allegations underlying her prior six claims,[202] and, as Pennsylvania's statute of limitations for infliction of emotional distress claims is also two years,[203] the holding here accords with those above. To the extent Oldham's infliction of emotional distress claims are predicated on Abashidze's alleged assault and Glon's failure to report, they are

---

[199] Doc. 105 ¶¶ 72–74.
[200] *Id*. ¶¶ 75–76, 120.
[201] *Cowell*, 263 F.3d at 292.
[202] Doc. 105 ¶¶ 172–74.
[203] *See Quintana*, 2018 WL 3632144 at *9.

untimely. However, to the extent they relate to Abashidze and Glon's alleged retaliatory campaign and Penn State and Harris's investigation into the alleged assault, the claims are timely.

### C.  Causes of Action

Independent of their arguments based on the statutes of limitations, the Defendants seek dismissal of Oldham's claims on substantive grounds.[204] Because the Court dismissed Oldham's battery claim (Count V) as untimely, it need only consider the remaining six counts.

### 1.  Title IX Claims (Counts I & II)

As a preliminary matter, Oldham's Title IX claims against Harris, Glon, and Abashidze fail because individuals cannot be held liable under Title IX. In *Fitzgerald v. Barnstable School Community*, the Supreme Court of the United States held that "Title IX reaches institutions and programs that receive federal funds," and has "consistently been interpreted as not authorizing suit against school officials, teachers, and other individuals."[205] Oldham attempts to characterize these claims as a "conspiracy to violate Title IX," but federal courts consistently reject such "end run[s] around Title IX's explicit language limiting

---

[204] *See* Doc. 113 at 15–40; Doc. 115 at 10–15, 17–33; Doc. 117 at 3–12.
[205] 555 U.S. 246, 257 (2009); *see also Kobrick v. Stevens*, 2014 WL 4914186, at *11 (M.D. Pa. Sept. 30, 2014) (Mannion, J.) ("[T]he court agrees with the . . . defendants that no individual liability lies under Title IX.").

liability to funding recipients."[206] Accordingly, Counts I and II as to Harris, Glon, and Abashidze are dismissed with prejudice.

That leaves Penn State as the only potentially viable defendant for these Counts. Penn State argues the Title IX claims should be dismissed because Oldham lacks standing to sue Penn State under Title IX: she "was not a student or employee of the University at any time, nor was she a community member or otherwise attempting to avail herself of an 'educational program or activity' under [Penn State or Harris's] control."[207] The Court agrees.[208]

To bring a cause of action under Title IX, as with any statutory claim, Oldham must have statutory standing.[209] For this, she needs to show that her "interests fall within the zone of interests protected by the law invoked."[210] Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to

---

[206] *Doe v. School Board of Broward Cty.*, 604 F.3d 1248, 1266 n.12 (11th Cir. 2010); *see also Petruska v. Gannon Univ.*, 2008 WL 2789260, at * 8 n.9, 9 (W.D. Pa. Mar. 31, 2008) (holding that a plaintiff's inability to "properly prosecute a claim against Defendants under Title IX" necessarily dooms the "conspiracy claim premised upon the same alleged unlawful conduct"); *Bennett v. Independent Blue Cross*, 1993 WL 65812, at *2 (E.D. Pa. Mar. 12, 1993) ("The United States Supreme Court has expressly stated that no cause of action exists for conspiracy to violate Title VII.").

[207] Doc. 113 at 16 (citing *Doe v. Brown Univ.*, 896 F.3d 127, 131–32 (1st Cir. 2018); *Jennings v. Univ. of North Carolina*, 482 F.3d 686 (4th Cir. 2007)).

[208] Separately, Penn State asserts that the allegations in the Amended Complaint do not establish either deliberate indifference or retaliation / hostile work environment under Title IX. *Id.* at 18–23. Because the Court finds that Oldham lacks standing to bring claims under Title IX, it need not reach these arguments.

[209] *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014).

[210] *Id.* (internal quotation marks and citation omitted).

discrimination under any education program or activity receiving Federal financial assistance."[211] Although the prototypical Title IX sexual harassment and retaliation / hostile environment cases involve students experiencing discrimination by their teachers or other agents of their schools,[212] courts recognize that "Title IX was drafted to cover 'any *person*,' not just any student."[213]

That said, the reach of Title IX is not boundless. After surveying the relevant case law on Title IX standing, the United States District Court for the Northern District of Illinois in *Conviser v. DePaul University* held that Supreme Court precedent "and the plain language of Title IX extend statutory standing to (i) employees of an education program or activity . . . and (ii) those who are denied access to an 'education program or activity.'"[214] But to establish standing based on her inability to access an educational program or activity, a plaintiff must be "so closely tied to a university that [she] is essentially a student of that university."[215]

---

[211] 20 U.S.C. § 1681(a). This statute carves out specific exceptions, but these exceptions are not relevant here. *Id.*

[212] *See, e.g., Doe v. Boyertown Area School District*, 897 F.3d 518, 533 (3d Cir. 2018) ("To recover on [a Title IX 'hostile environment harassment'] claim, a plaintiff must establish sexual harassment that is so severe, pervasive, or objectively offensive and that so undermines and detracts from the victim's *educational experience* that [he or she] is effectively denied equal access to an institution's resources and opportunities.") (emphasis added); *DeJohn v. Temple Univ.*, 537 F.3d 301, 316 n.14 (3d Cir. 2008) (noting that "the right of a public school student to sue a school under Title IX for 'hostile environment' harassment . . . applies to cases involving harassment of a student by a teacher or other agent of a school, as well as for certain cases of student-on-student harassment"); *Jennings*, 482 F.3d at 695 ("To establish a Title IX claim on the basis of sexual harassment, a plaintiff must show that . . . she was a student at an educational institution receiving federal funds.").

[213] *Winter v. Pennsylvania State Univ.*, 172 F. Supp. 3d 756, 775 (M.D. Pa. 2016) (Caputo, J.).

[214] 532 F. Supp. 3d 581, 592 (N.D. Ill. 2021).

[215] *Doe v. University of Kentucky*, 971 F.3d 553, 559 n.4 (6th Cir. 2020) (holding that "there remain genuine disputes as to whether" a non-student, non-employee who nevertheless lived

45

Indeed, plaintiffs who "are not the direct beneficiaries of programs covered by Title IX"[216] or who are "deprived . . . of [only] an economic benefit" lack statutory standing to sue under Title IX.[217]

Here, Oldham is not and never has been a student at Penn State. She is not and never has been a Penn State employee. Instead, Oldham is a private fencing instructor who operates a fencing club and training facility in Durham, North Carolina.[218] Oldham has not identified, and the Court is not aware of, any case in which a court held that a similarly situated private instructor with no affiliation to a university defendant possessed statutory standing to sue under Title IX.

Nevertheless, Oldham argues that she "has Title IX standing because she seeks, and is being denied, access to Penn State programs and opportunities, i.e., fencing workshops, competitions, recruitment opportunities, etc. held at Penn State."[219] But Oldham has not alleged, and the Amended Complaint does not show, that Oldham was a "direct beneficiar[y] of programs covered by Title IX"[220]—that is, she is not an athlete seeking to attend the Penn State workshops, participate in

---

in University housing and paid for a University dining plan and other University student fees "was denied the benefits of an 'education program or activity' furnished by the University").

[216] *Young v. Pleasant Valley School District*, 2008 WL 417739, at *6 (M.D. Pa. Feb. 13, 2008) (Munley, J.); *see also Dipippa v. Union School District*, 819 F. Supp. 2d 435, 446 (W.D. Pa. 2011) ("Generally speaking, parents of a student whose rights were violated do not have standing to assert personal claims under Title IX, but do have standing to assert claims on the student's behalf.").

[217] *Conviser*, 532 F. Supp. 3d at 593.

[218] Doc. 105 ¶ 11.

[219] Doc. 125 at 18 (citing Doc. 105 ¶¶ 104–05, 108–11).

[220] *Young*, 2008 WL 417739 at *6.

Penn State fencing competitions, or compete for collegiate fencing recruitment opportunities. Instead, the intended beneficiaries allegedly affected by Oldham "reduc[ing] her attendance at regional- and national-level fencing tournaments in the United States, international tournaments, games and events, workshops, and collegiate recruitment events" are Oldham's clients (i.e., the "recruitable (college-bound) athletes" she describes as "her students").[221] The only direct harm Oldham alleges she suffered is financial:

> It is [Oldham's] belief that Penn State, and other NCAA fencing programs headed by friends of Glon and Abashidze, would not recruit or offer fencing scholarships to any of her students, thus reducing the appeal of her fencing academy. As a result, she has lost recruitable (college-bound) athletes to a neighboring club.[222]

But such economic harms—suffered by someone who is not the direct beneficiary of a program covered by Title IX—do not establish Title IX standing.[223]

Alternately, Oldham asserts that she has "vicarious standing" to sue on behalf of "her college-bound fencing students who have been denied recruitment and scholarship opportunities, at Penn State and elsewhere, because of the retaliation against her."[224] But, again, Oldham cites no case law supporting her position, and the Court is not aware of any cases recognizing vicarious standing in

---

[221] Doc. 105 ¶¶ 107–08.
[222] *Id.* ¶ 107.
[223] *See Conviser*, 532 F. Supp. 3d at 593; *Young*, 2008 WL 417739 at *6.
[224] Doc. 125 at 20 (citing Doc. 105 ¶ 111).

the Title IX context. Indeed, as discussed, the case law on Title IX standing establishes that efforts to sue under Title IX indirectly, on behalf of others are generally impermissible.[225] The Court sees no reason to deviate from this general rule.

For these reasons, the Court finds that Oldham lacks standing to sue Penn State under Title IX. Counts I and II of the Amended Complaint are therefore dismissed with prejudice.

## 2.      Defamation (Count III)

As previewed, Oldham's defamation claim is deeply flawed. The Defendants move for dismissal, arguing that the alleged defamatory statement made during the SafeSport arbitration is protected by privilege, and the other unspecified defamatory statements—made on "unknown dates" at unspecified locations to unidentified "fencing colleagues"—lack the particularity required to sustain a claim for defamation.[226] The Court agrees.

Under Pennsylvania law, a claim for defamation includes the following four elements: (1) "[t]he defamatory character of the communication"; (2) "[i]ts publication by the defendant"; (3) "[i]ts application to the plaintiff"; (4) "[t]he

---

[225] *See, e.g., Young*, 2008 WL 417739, at *6; *Dawn L. v. Greater Johnstown School District*, 586 F. Supp. 2d 332, 376 (W.D. Pa. 2008) ("Claims for retaliation are . . . only available to those who have actually engaged in a protected activity themselves; Title IX does not extend this protection to the actor's friends and family.") (citing *Fogleman v. Mercy Hospital, Inc.*, 283 F.3d 561, 567 n.4, 568–70 (3d Cir. 2002)).

[226] *See* Doc. 113 at 25–27; Doc. 133 at 17; Doc. 134 at 20–21.

understanding by the recipient of its defamatory meaning"; and (5) "[t]he

understanding by the recipient of it as intended to be applied to the plaintiff."[227]

That said, the "publisher of defamatory material is not liable if the publication was

made subject to a privilege and the privilege was not abused."[228] Relevant here,

"[p]ursuant to the judicial privilege, a person is entitled to absolute immunity for

communications which are issued in the regular course of judicial proceedings and

which are pertinent and material to the redress or relief sought."[229]

First, the Defendants argue that arbitration proceedings before SafeSport—a

Congressionally created and federally funded entity "empowered to adjudicate

allegations of sexual assault in sport through a binding arbitration process"[230]—

qualify as "quasi-judicial proceedings," and, as such, all statements made during

these proceedings are accorded an absolute privilege.[231] Oldham dismisses these

arguments as "immaterial," explaining that she "alleges that Glon called [her] 'a

liar' at the SafeSport adjudication of Abashidze, not as the basis of liability for the

tort, but as concrete evidence of what he said more broadly in the fencing

community."[232] The Court interprets Oldham's response as a concession that

---

[227] *Graboff*, 744 F.3d at 135; *see also* 42 Pa. C.S. § 8343(a).

[228] *Bennett v. Itochu Int'l, Inc.*, 682 F. Supp. 2d 469, 476 (E.D. Pa. 2010) (citing *Chicarella v. Passant*, 494 A.2d 1109, 1112 (Pa. Super. 1985)).

[229] *Bochetto v. Gibson*, 860 A.2d 67, 71 (Pa. 2004) (internal quotation marks, citation, and emphasis omitted).

[230] Doc. 113 at 26; *see also* 36 U.S.C. § 220541(c).

[231] Doc. 113 at 25–27.

[232] Doc. 125 at 28.

Glon's testimony during the SafeSport arbitration proceeding are protected by privilege, and, as such, cannot serve as a basis for her defamation claim.

Second, the Defendants assert that Oldham's allegations that Glon and Abashidze made other defamatory statements at "unknown dates" to unidentified members of the "fencing community" lack the specificity required to sustain a claim for defamation.[233] Under Federal Rule of Civil Procedure 8, "to bring a claim for defamation in federal court, only notice pleading is required to survive a motion to dismiss."[234] Put differently, "the plaintiff does not have to plead the precise defamatory statement as long as the count provides sufficient notice to the defendant."[235]

Unfortunately, judges in this district disagree about what facts are required to "provide sufficient notice."[236] But as explained in *Cauley v. Geisinger Clinic*, I

---

[233]  Doc. 113 at 25–27; Doc. 133 at 17; Doc. 134 at 20–21.

[234]  *Peoples State Bank v. Wellsburg Truck Auto Sales, Inc.*, 2010 WL 4922877, at *3 (M.D. Pa. Nov. 29, 2010) (Caputo, J.) (citing Fed. R. Civ. P. 8).

[235]  *Roskos v. Sugarloaf Twp.*, 295 F. Supp. 2d 480, 492 (M.D. Pa. 2003) (Conaboy, J.).

[236]  2022 WL 265947, at *6–7 (M.D. Pa. Jan. 27, 2022) (*comparing Peoples State Bank*, 2010 WL 4922877, at *3 (holding that for defamation claims, notice pleading requires the plaintiff to allege "to *whom* the [allegedly defamatory] words were spoken, *where* they were spoken, [and] *when* they were spoken"); *Fiedler v. Shady Grove Reproductive Science Center, P.C.*, 2014 WL 3535558, at *4–5 (M.D. Pa. July 16, 2014) (Connor, J.) (dismissing defamation claim where plaintiff "fails to allege where or how the statement was made" and "when the statement was made"); *Klatch-Maynard v. Sugarloaf Twp.*, 2012 WL 3597185, at *3 (M.D. Pa. Aug. 20, 2012) (Kane, J.) (dismissing defamation claim when plaintiff failed to satisfy "obligation to put forth evidence that a defamatory statement was made," which "includes putting forth evidence that a defamatory statement was made on a particular date"), *with Reager v. Williams*, 2009 WL 3182053, at *4–5 (M.D. Pa. Sept. 25, 2009) (Munley, J.) (permitting a defamation claim to proceed past the motion to dismiss phase despite the complaint failing to detail "what the allegedly defamatory statements were and who made the statements and to whom they were made" because allegations that the defendants "attempted to create the impression that plaintiff is morally depraved and paint the plaintiff in a bad light portraying him as an immoral

stand with the majority of my colleagues in requiring a plaintiff advancing a defamation claim to allege, at a minimum, who made the allegedly defamatory statement, to whom the statement was made, where it was made, and when it was made.[237] The federal pleading standards may be liberal, but they require more than bare allegations that "fail[] to identify with any degree of specificity the substance and circumstances of the representations at issue."[238]

In her Amended Complaint, Oldham alleges that Abashidze and Glon shared "falsehoods" with their "friends and supporters in the fencing community and those who were doubters of the burgeoning international #metoo movement,"[239] and asserts that she "heard colleagues minimize and dismiss the assault because Abashidze did not 'present an immediate threat to minors,' or Abashidze merely 'brushed someone's arm on a plane.'"[240] But Oldham does not detail what Abashidze and Glon purportedly said, when or where they made these statements, or who precisely they made these statements to. Instead, Oldham asks the Court to simply accept that Glon and Abashidze made defamatory statements as "the only reasonable inference" one could draw based on her alleged ostracization within the

---

individual conducting business in a dirty way that included victimizing young women" were "sufficient to place the defendants on notice of the defamation claim and sufficiently precise for the defendants to respond to them")).

[237] *Id.*

[238] *Fiedler*, 2014 WL 3535558, at *5.

[239] Doc. 105 ¶ 78.

[240] *Id.* ¶ 108.

fencing community.[241] However reasonable these inferences may be, inferences alone do not state a claim for defamation.

Further, Oldham's remaining defenses of her defamation pleadings flatly contradict one another. Oldham first argues that "in these circumstances, further investigation and discovery are required to develop the details of precisely what Glon and Abashidze have said, and to whom."[242] But she then changes course, arguing that she does, in fact, possess the requisite details about Glon's and Abashidze's purportedly defamatory statements, but she intentionally omitted this information as an act of discretion: "[Oldham] is aware of many specific individuals [to whom Glon and/or Abashidze allegedly made defamatory statements about her] but has not named them, discretion being the better part of valor."[243]

The Court does not question Oldham's intentions here, but her legal judgment is suspect. Because the Amended Complaint does not identify with any degree of specificity the circumstances of the allegedly defamatory statements at issue—i.e., when, where, and to whom the statements were made—Oldham's defamation claim fails to meet the pleading requirements of the Federal Rules of Civil Procedure.

---

[241] Doc. 125 at 14; *see also id*. at 28 ("If Glon would falsely accuse Ms. Oldham of lying when he was under oath [at the SafeSport adjudication], it stands to reason that he had no inhibitions about repeating that falsehood elsewhere.").

[242] Doc. 126 at 16.

[243] *Id*.

### 3.      Failure to Train/Supervise (Count IV)

For Count IV of the Amended Complaint, Oldham asserts a claim for

negligent failure to train and/or supervise its employees on sexual misconduct

claims against three of the Defendants: Penn State, Harris, and Glon. Because

Pennsylvania courts have promulgated a specific standard for negligent supervision

claims, but not for negligent training claims, the Court addresses each claim

independently.[244]

### a.      Negligent Supervision

To sustain a claim for negligent supervision under Pennsylvania law, a

plaintiff must show that her loss resulted from "(1) a failure to exercise ordinary

care to prevent an intentional harm by an employee acting outside the scope of his

employment, (2) that is committed on the employer's premises, (3) when the

---

[244] In their briefing on the motions to dismiss, the parties treat this Count as only a duty to supervise; they do not confront the distinct issues relevant to negligence claims based on a failure to train theory. *See* Doc. 113 at 29–31; Doc. 124 at 30–31; Doc. 125 at 33–35. For Oldham, this is perfectly understandable, as courts in North Carolina impose a single standard for tort liability based on an employer's negligent training, supervision, and/or retention of an employee, *see Taft v. Brinley's Grading Services, Inc.*, 738 S.E.2d 741, 750 (N.C. App. 2013) (articulating a single legal standard for a "claim for negligent hiring, supervision and retention"), and she asks this Court to apply North Carolina law. But Pennsylvania law governs this Count, and Pennsylvania courts impose distinct legal standards for negligent supervision and negligent training claims. *Compare Belmont v. MB Investment Partners, Inc.*, 708 F.3d 470, 487–88 (3d Cir. 2013) (recognizing distinct standard under Pennsylvania law for negligent supervision claims), *with Kaminski v. Mydatt Services Inc.*, 2012 WL 2089741, at *4 (W.D. Pa. June 8, 2012) ("Corporate Defendants cite no cases, and this Court has not found any cases, which promulgate a standard for negligent training different that the normal negligence standard."). Because the Amended Complaint includes under this Count specific allegations relevant to Glon's and Harris's purported failure to train—i.e., "Glon and/or Harris neglected their duty and failed to provide adequate annual sexual misconduct policy and Title IX training to all members of the Fencing Team's coaching staff," Doc. 105 ¶ 153—the Court addresses this issue as well.

employer knows or has reason to know of the necessity and ability to control the employees."[245] Additionally, "[n]egligent supervision requires the four elements of common law negligence, *i.e.*, duty, breach, causation, and damages."[246]

Penn State, Harris, and Glon argue that Oldham's negligent supervision claim fails for three reasons: (1) they did not owe a duty to Oldham; (2) Glon's and Harris's conduct falls outside the claim because they were acting within the scope of their employment; and (3) the only alleged "intentional harm" that could have resulted from allegedly negligent supervision—that is, the alleged assault by Abashidze—did not occur on Penn State property.[247] The Court addresses each argument in turn.

First, Penn State, Harris, and Glon assert that neither the University nor the individual Defendants owed any legal duty to Oldham because she was not a Penn State student or employee, or a participant in a Penn State program, and none of them had a "special relationship with Oldham sufficient to impose a legal duty of care."[248] But these Defendants misconstrue the nature of the duty at issue in negligent supervision claims. As the Superior Court of Pennsylvania explained in *Brezenski v. World Truck Transfer, Inc.*, although there is generally "no duty to control the conduct of a third person to prevent others from harm," a duty arises

---

[245] *Belmont*, 708 F.3d at 487–88 (citing *Dempsey v. Walso Bureau, Inc.*, 246 A.2d 418, 420 (Pa. 1968); *Heller v. Patwil Homes, Inc.*, 713 A.2d 105, 107–08 (Pa. Super. 1998)).
[246] *Id.* (citing *Brezenski v. Word Truck Transfer, Inc.*, 755 A.2d 36, 42 (Pa. Super. 2000)).
[247] Doc. 113 at 30–31.
[248] *Id.* at 31.; *see also* Doc. 115 at 23–27.

when "there is a special relationship between the actor and the third person or between the actor and the injured party."[249] For negligent supervision, the "special relationship" at issue is not between the defendants and the injured party (i.e., Oldham), but between the defendants and the third person who caused the injury (here, Abashidze and, for Penn State, Glon or Harris).[250] Accordingly, the issue here is not whether these Defendants had a "special relationship" with Oldham sufficient to impose a legal duty, but whether they had a special relationship with their employees (or, in the case of Harris and Glon, the Penn State employees under their supervision) such that they can be held liable for foreseeable harm the employees caused. They did, and, therefore, they can.

Second, these Defendants note that Oldham "expressly alleges that Glon and Harris were acting 'within the course and scope of their respective employment at all relevant times.'"[251] Because "[a] claim for negligent supervision covers only the wrongful acts of employees which are outside the scope of their employment or not in furtherance of the principal's business,"[252] Penn State argues that "the plain

---

[249] 755 A.2d at 40.

[250] *Id.* at 40–41 (noting that Section 317 of the Restatement (Second) of Torts, which "sets for the duties of a master to control the conduct of a servant," establishes a legal duty "where a special relationship exists between the actor (defendant) and the third person (wrongdoer)"); *see also Belmont*, 708 F.3d at 488 (explaining that negligent supervision claims are "predicated on two duties of an employer: the duty to reasonably monitor and control the activities of an employee, and the duty to abstain from hiring an employee and placing that employee in a situation where the employee will harm a third party").

[251] Doc. 113 at 30 (citing Doc. 105 ¶ 151).

[252] *Maloney v. Mt. Airy #1, LLC*, 2020 WL 1082598, at *4 (M.D. Pa. Mar. 4, 2020) (Mannion, J.); *see also Gilmour v. Bohmueller (In re American Investors Life Insurance Co. Annuity Marketing & Sales Practices Litig.)*, 2007 U.S. Dist. LEXIS 64967, at *90 (E.D. Pa. Aug. 29,

language of the [Amended] Complaint forecloses this claim."[253] On this, the
Defendants are correct, but only in part. As Oldham does not allege that Harris's
and Glon's injurious conduct occurred outside the scope of their employment—
indeed, she alleges the opposite—she cannot sustain a negligent supervision claim
against Penn State based on the actions of these two employees. However, that
does not foreclose a claim of negligent supervision against Penn State, Harris, and
Glon based on the actions of a separate employee—namely, Abashidze.

Third, these Defendants argue that "the only pled 'intentional harm' that
could have resulted from purportedly negligent training or supervision did not
occur on the University's premises"—a necessary element for a negligent
supervision claim.[254] Although these Defendants ignore other intentional harms
that Oldham connects to their failure to supervise—namely, Abashidze and Glon's
alleged retaliatory defamation campaign—their broader point is correct: Oldham
does not allege that Abashidze committed an intentional harm on Penn State
property.

To sustain a claim for negligent supervision under Pennsylvania law, a
plaintiff must allege "an intentional harm by an employee" that was "committed on

---

2007) (dismissing negligent supervision claim at pleading stage because "[n]owhere in the
complaints do the plaintiffs allege that the [defendants' employees] were acting outside the
scope of their agency").

[253] Doc. 113 at 30.

[254] *Id.*

the employer's premises."[255] As discussed in the prior section on the statute of limitations, the alleged assault by Abashidze cannot serve as the predicate for this claim as it does not implicate either the continuing tort doctrine or equitable estoppel. But even if it did, the alleged assault by Abashidze occurred "on a domestic flight somewhere over the Great Plains region of the United States"—not on Penn State's premises.[256] Additionally, the alleged retaliatory defamation campaign likewise lacks any locational nexus to Penn State: the Amended Complaint contains no allegations that Abashidze made any defamatory statements while on Penn State's campus or other University property.

Oldham asserts that based on her allegations, it is not clear "that Glon and Abashidze never, for example, defamed Oldham in conversation from their offices [or] on [Penn State] phones."[257] But that won't do. Oldham cannot salvage her claim by noting that her allegations don't prove that the alleged, unspecified defamatory statements were made off Penn State property. As the plaintiff, she bears the burden of establishing that these injurious acts did, in fact, occur on Penn State's premises. She has failed to do so, and, as such, she has not adequately pleaded a claim for negligent supervision.

---

[255] *Belmont*, 708 F.3d at 487–88.
[256] Doc. 105 ¶ 1.
[257] Doc. 125 at 29.

### b.    Negligent Training

Pennsylvania courts have held that employers may be held liable under a theory of negligence for failing to adequately train their employees.[258] However, it appears that neither the Supreme Court of Pennsylvania nor its subsidiary courts have outlined the contours of an employer's duty to train its employees or the pleading standards for alleging breach.[259] Accordingly, when confronted with negligent training claims, federal courts have done their level best to divine how Pennsylvania courts would rule on this issue.

Recognizing that Pennsylvania courts have not promulgated a specific standard for negligent training, the United States District Court for the Western District of Pennsylvania in *Kaminski v. Mydatt Services Inc.* applied "the normal negligence standard."[260] Specifically, the court held that "to prove a prima facie case for negligence [on a failure to train theory], plaintiffs must show that corporate defendants (1) had a duty to train their employees; (2) breached that duty; and (3) the breach of that duty caused the plaintiffs' harm."[261]

---

[258] *See, e.g.*, *Shiflett v. Lehigh Valley Health Network, Inc.*, 217 A.3d 225, 229, 235 (Pa. 2019) (affirming jury verdict against hospital for "corporate negligence related to the Hospital's alleged failure to train [a] nurse"); *Morder v. Professional Aerials Inc.*, 2006 WL 5820609 (Pa. Com. Pl.) (affirming jury verdict against employer for its negligent failure to train its employee).

[259] *See Kaminski*, 2012 WL 2089741, at *4 ("Corporate Defendants cite no cases, and this Court has not found any cases, which promulgate a standard for negligent training different that the normal negligence standard.").

[260] 2012 WL 2089741, at *4.

[261] *Id*. (cleaned up).

For the first prong, "a plaintiff must assert that the defendant employer had a duty to train its employees on a particular issue."[262] Citing the Pennsylvania Superior Court's ruling in *Brezenski*, the United States District Court for the Eastern District of Pennsylvania held in *Bracke v. Eiteone Landscape Supply, LLC* that "[a]n employer has a duty to train its employees only on those issues that could themselves give rise to a cause of action for negligence."[263]

Here, Oldham alleges that Penn State, Harris, and Glon failed to provide the University employees under their supervision—in particular, the "members of the Fencing Team's coaching staff"—with "adequate annual sexual misconduct policy and Title IX training."[264] As discussed, Oldham points to Penn State's "AD85 Sexual and/or Gender-Based Misconduct and Harassment" policy as well as its "sexual misconduct policies," which prohibit sexual harassment as well as "retaliation" against individuals involved in "reporting, investigat[ing], or resol[ving]" alleged sexual misconduct violations.[265] These policies also require "Responsible Employees" to "report incidents of possible Prohibited Conduct to the Title IX Coordinator."[266]

---

[262] *Bracke v. Eiteone Landscape Supply, LLC*, 2022 WL 1128951, at *2 (E.D. Pa. Apr. 15, 2022).
[263] *Id.* (citing *Brezenski*, 755 A.2d at 42)).
[264] Doc. 105 ¶ 153.
[265] *Id.* ¶¶ 33–34, 37.
[266] *Id.*

Because neither the alleged sexual assault nor Glon's failure to report can serve as viable predicates for Oldham's failure to train claim,[267] the only alleged conduct relevant here is Abashidze and Glon's retaliatory defamation campaign. But Oldham does not identify, and the Court is not aware of, any cases establishing under Pennsylvania law a broad "duty not to retaliate" that extends to individuals with whom the defendants have no employment relationship.[268]

Moreover, even if Penn State, Harris, and Glon had a duty to administer "adequate annual sexual misconduct policy and Title IX training,"[269] Oldham has not sufficiently pleaded that they breached this duty. For this second prong, a plaintiff must allege in "specific terms" how the defendant breached its duty to properly train individual employees; "mere conclusory statements" that amount to nothing more than a recitation of the elements of the claim are insufficient.[270]

The Amended Complaint contains only one allegation relevant to the training at issue: "Glon and/or Harris neglected their duty and failed to provide adequate annual sexual misconduct policy and Title IX training to all members of the Fencing Team's coaching staff."[271] Oldham provides no information on what

---

[267] *See supra* Section III.B.3 (Statute of Limitations: Failure to Train/Supervise (Count IV)).

[268] To the extent courts applying Pennsylvania law have recognized a common law "duty not to retaliate," it appears they have done so only in the employer-employee context. *See*, *e.g.*, *In re Hyman Companies*, 497 B.R. 465, 478 (Bankr. E.D. 2013) (recognizing a "duty not to retaliate against an employee [that] arises independently from the employment contract").

[269] Doc. 105 ¶ 153.

[270] *Kaminski*, 2012 WL 2089741, at *4–5.

[271] Doc. 105 ¶ 153.

trainings occurred, who did (or did not) receive them, and why they were purportedly deficient. Absent some specific facts showing how Penn State, Harris, and Glon breached their duty to properly train their employees and/or staff, Oldham cannot sustain a claim for negligent training.

Because Oldham has not adequately pleaded a claim for negligent supervision or negligent training, Count IV is dismissed. For her negligent supervision claim, the Court will grant Oldham an opportunity to plead over and remedy the identified deficiencies in the Amended Complaint. However, because Penn State, Harris, and Glon were not subject to a duty to train their employees not to retaliate against independent individuals unaffiliated with Penn State or its fencing program, the negligent training claim fails as a matter of law; to the extent Count IV is predicated on this theory of liability, it is dismissed with prejudice.

### 4. Negligence / Gross Negligence (Count VI)

For Count VI, Oldham asserts a claim for negligence / gross negligence against all Defendants based on an alleged breach of their duties to (1) "keep [Oldham] safe from sexual assault and harassment by Abashidze while he was traveling and acting as a representative of Penn State to the community," and (2) "handle her claims [of the sexual assault] properly and in good faith."[272] But this claim has been narrowed considerably due to the statute of limitations. As discussed, neither the alleged assault nor Glon's failure to report it constitute valid,

---

[272]  Doc. 105 ¶¶ 166–67.

timely predicates for Oldham's negligence-based claims, and, as such, Count VI as to Abashidze and Glon has been dismissed with prejudice. That leaves only Penn State and Harris as viable defendants. Additionally, the scope of this claim is limited to Oldham's allegations that the University and Harris breached their duty handle her claims of sexual assault in good faith.

Penn State and Harris ask the Court to dismiss Oldham's negligence claims because they did not "owe [Oldham] a duty with respect to [the] investigation or handling of her Title IX allegations."[273] These Defendants argue that because "Title IX's protections do not extend to Oldham" and the University and Harris "did not assume a duty to Oldham under Title IX or otherwise" by simply "investigat[ing] her allegations concerning Abashidze," they do not have any "special relationship" with Oldham.[274]

Oldham responds that Penn State and Harris, after "learn[ing] their [assistant] fencing coach sexually assaulted Oldham while traveling on [the University's] behalf," assumed a duty "to mitigate the harm" done to her.[275] According to Oldham, it is "commonsensical" that "society expects one to take reasonable measures to prevent [foreseeable harm]."[276]

---

[273] Doc. 113 at 33.
[274] *Id*. at 34 (citing *Borkowski v. Baltimore County, Md.*, 492 F. Supp. 3d 454, 488 (D. Md. 2020)).
[275] Doc. 125 at 30–33; *see also* Doc. 124 at 27–28 (same).
[276] Doc. 125 at 31.

But Pennsylvania courts do not impose on all individuals and institutions a legal duty to prevent or mitigate any harm they can reasonably foresee. Instead, as the Penn State and Harris assert, a defendant's duty to prevent or mitigate harm exists only when it maintains a "special relationship" with the injured party.[277] Here, Oldham fails to allege that she, Penn State, and Harris maintained this type of "special relationship." As noted, Oldham is a private fencing instructor with no direct connection to Penn State. She is not, and never has been, a student or employee of the University, and she was not the direct beneficiary of any of the Penn State fencing competitions, workshops, or programs relevant here. The mere fact that Penn State investigated Oldham's allegations of assault does not meaningfully alter this dynamic: the investigation alone does not create a legal duty under Title IX,[278] and Oldham offers no argument for why it should be any different under the common law. To the extent Oldham asserts that this duty arises out of Penn State policies, the Defendants correctly explain that such policies do not create a common law duty capable of sustaining a negligence action.[279]

---

[277] Doc. 113 at 33–34; *see also* Doc. 115 at 25–26 (citing *Brezenski*, 755 A.2d at 40 (holding that an individual "has no duty to control the conduct of a third party to protect another from harm, except where a defendant stands in some special relationship . . . with the intended victim of the conduct, which gives the intended victim a right to protection")).

[278] *See Borkowski*, 492 F. Supp. 3d at 488 ("The University Defendants correctly argue that, '[t]he mere fact that [the university] investigated the three respondents to determine if their actions violated [the university's policy] does not mean the [university] owed [plaintiffs] duties under Title IX.").

[279] *See* Doc. 115 at 24–25 (citing *Humphries v. Pennsylvania State Univ.*, 2020 WL 5878409, at*8 (M.D. Pa. Oct. 2, 2020) (rejecting former student athlete's claim that Penn State and its football coach owed him a duty of care under the University's antihazing policy and administrative

Grasping for some basis for the legal duty she asserts, Oldham points only to the Pennsylvania Superior Court's ruling in *Commonwealth v. Spanier*.[280] There, the court rejected an argument by Defendant Graham Spanier, the former president of Penn State, that "he owed no duty of care" to victims of former Penn State assistant football coach Jerry Sandusky.[281] The court held that once Spanier became "aware of specific allegations of sexual abuse," he owed a duty to the abused victims because he occupied a position of authority, "oversaw his institution's response," and "had sufficient information and authority to take action."[282]

But Penn State and Harris correctly respond that *Spanier* and the instant case are inapposite.[283] Specifically, Penn State explains that Spanier's duty to Sandusky's victims stemmed, in part, from the relationship between the University and the victims—"they were Sandusky's unauthorized invitees" on Penn State property.[284] Conversely, here, no such relationship exists: "Oldham was not an invitee. She was not on University property. She was not at a University event. She was on an airplane over the Midwest at the time of the assault."[285] Further, Penn

---

policies, explaining that "previous courts have found that simply enacting policies does not create new duties for entities.").

[280] 192 A.3d 141 (Pa. Super. 2018).

[281] *Id*. at 150–54.

[282] *Id*.

[283] Doc. 133 at 24.

[284] *Id*. at 23.

[285] *Id*.

State and Harris note that "*Spanier* was decided (1) on the basis that the defendant owed a duty to a minor child (2) under a statute concerning endangering the welfare of children (3) and in the context of an assessment of 'what particular conduct is rendered criminal' under the statute."[286] None of these considerations exist here.

Moreover, even if Penn State and Harris owed Oldham a duty to investigate her claim in good faith, she has not properly alleged that either Defendant breached this duty. As Penn State and Harris explain, the Amended Complaint establishes that "in response to Oldham's complaints, the University conducted an investigation that ultimately resulted in Abashidze's termination."[287] Oldham expresses frustration with the scope of Penn State's investigation and the substance and timing of the University's conclusions.[288] But dissatisfaction with a school's investigation does not establish a Title IX violation,[289] and Oldham again offers no

---

[286]  *Id*. at 23–24 (internal citations omitted).

[287]  Doc. 113 at 18 (citing Doc. 105 ¶¶ 76, 104).

[288]  *See* Doc. 125 at 20–21 ("Penn State and Harris were repeatedly informed of the ongoing harm from Glon and Abashidze[]" but that "they refused to investigate or discipline Glon, or otherwise to take any measures to halt the discriminatory conduct.").

[289]  *See D.V. by and through B.V. v. Pennsauken School District*, 247 F. Supp. 3d 464, 477 (D.N.J. 2017) (holding that when a school "attempts to investigate" an allegation of harassment, the plaintiff cannot establish "a Title IX violation occurred" simply by asserting that he or she was "not satisfied with the . . . investigation"); *Karasek v. Regents of Univ. of California*, 956 F.3d 1093, 1106–08 (9th Cir. 2020) (dismissing plaintiff's Title IX deliberate indifference claim—despite the university defendant's thirteen-month delay in resolving complaint of assault and failure to follow its policies and communicate with the plaintiff—because the school "investigated [the plaintiff's] complaint, met with her assailant shortly after she submitted her written report, and eventually imposed sanctions").

argument for why such dissatisfaction equates to a breach of a common law equivalent.

Accordingly, the Court finds that neither Penn State nor Harris owed Oldham a legal duty to "handle her claims [of sexual assault] properly and in good faith,"[290] and even if they did, Oldham has not adequately alleged that the University or Harris breached this duty. Count VI is therefore dismissed with prejudice.

### 5.  Negligent/Intentional Infliction of Emotional Distress (Count VII)

For Count VII, Oldham pleads claims for the negligent infliction of emotional distress ("NIED") and the intentional infliction of emotional distress ("IIED").[291] But these claims have also been narrowed by the statute of limitations and are now viable only regarding the two following factual predicates: (1) Abashidze and Glon's alleged retaliatory campaign; and (2) Penn State and Harris's investigation into the alleged assault. To that end, neither predicate supports a claim for the infliction of emotional distress—negligent or intentional.

First, Pennsylvania law recognizes a claim for NIED in the following scenarios: "(1) situations where the defendant had a contractual or fiduciary duty toward the plaintiff; (2) the plaintiff was subjected to a physical impact; (3) the plaintiff was in a zone of danger, thereby reasonably experiencing a fear of

---

[290]  Doc. 105 ¶ 166.
[291]  Doc. 105 ¶¶ 172–82.

impending physical injury; or (4) the plaintiff observed a tortious injury to a close relative."[292] A plaintiff seeking recovery for NIED must also establish the elements of a negligence claim.[293]

As discussed, Oldham has not stated a viable claim for negligence against any of the Defendants: the claim as to Abashidze and Glon was untimely, and neither Penn State nor Harris owed Oldham a duty to investigate her claim of sexual assault "properly and in good faith."[294] Further, even if Oldham's general negligence claim as to Abashidze and Glon was timely, it would nevertheless fail for the same reason this Court dismissed Oldham's negligent training claim as to Glon—that is, Pennsylvania does not recognize a broad "duty not to retaliate" that would attach to either Abashidze or Glon in this circumstance.[295] Because establishing the elements of a negligence claim is a necessary predicate,[296] Oldham fails to state a claim for NIED.

Second, under Pennsylvania tort law, a plaintiff alleging IIED must show the following: (1) the conduct was extreme and outrageous; (2) it was intentional or reckless; (3) it caused emotional distress; and (4) that distress was severe.[297] The plaintiff must show that the conduct at issue was "so outrageous in character and

---

[292] *Toney v. Chester County Hospital*, 961 A.2d 192, 197–98 (Pa. Super. 2008), *aff'd*, 36 A.3d 83 (Pa. 2011).

[293] *Id*. at 198.

[294] Doc. 105 ¶ 166.

[295] *See supra* Section III.C.3.b.

[296] *Toney*, 961 A.2d at 197–98.

[297] *Hoy v. Angelone*, 691 A.2d 476, 482 (Pa. Super. 1997).

so extreme in degree as to go beyond all possible grounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society."[298] Finally, the plaintiff must show that he suffered "some type of resulting physical harm due to the defendant's outrageous conduct."[299]

Oldham's IIED claim misses the mark on several fronts. As a preliminary matter, Oldham has not alleged that either viable factual predicate—i.e., the alleged retaliatory campaign or the investigation into the assault—caused her to suffer "physical harm."[300] Oldham alleges that this conduct caused her to suffer "severe mental distress and emotional injuries," including stress, anxiety, "loss of sleep," an "inability to perform work tasks," and "feelings of depression, despair, and humiliation" as well as "intense grief at the loss of friendships, and feelings of betrayal by her former friends, professional peers, and her primary coach-mentor."[301] Regardless of how genuine and consequential these mental and emotional harms may be, they are not connected to any alleged physical injury.[302]

More importantly, neither the alleged retaliatory campaign nor the investigation into Oldham's claims constitute the type of "extreme and outrageous"

---

[298] *Miller v. Comcast*, 724 F. App'x. 181, 182 (3d Cir. 2018) (quoting *Hoy*, 720 A.2d at 754).
[299] *Reedy v. Evanson*, 615 F.3d 197, 231 (3d Cir. 2010) (quotation marks omitted).
[300] *Id*.
[301] Doc. 105 ¶ 101.
[302] *See*, *e.g.*, *Borregine v. Messiah College*, 2013 WL 6055214, at *4 (M.D. Pa. Nov. 15, 2013) (Kane, J.) (dismissing IIED claim because plaintiff's "sole averment . . . that she 'has suffered severe emotional distress for which she is in on-going treatment' . . . is ambiguous, and no specific resulting physical symptoms are alleged in the complaint").

conduct actionable as an IIED claim. According to Oldham, Abashidze and Glon

spread falsehoods about Oldham and refuted her claims of sexual assault, calling

her a "liar"[303] and asserting that Abashidze merely "brushed someone's arm on a

plane" and therefore "did not present an immediate threat to minors."[304] Accepted

as true, these actions qualify as vindictive; however, "they do not reach the *extreme*

level of outrageous required for an [IIED] cause of action."[305] Similarly, the

allegations regarding Penn State and Harris's Title IX investigation into Oldham's

complaint—specifically, the findings that Abashidze had not violated any Penn

State policy,[306] the absence of any discussion of Glon's conduct,[307] and the delayed

final determination[308]—may well present some legal and public relations

complications for the University and Harris; they are not, however, "so

---

[303] Doc. 105 ¶ 119.

[304] Please note: Oldham does not attribute these claims to Abashidze and Glon directly, but instead attributes these statements to "friends of Glon and Abashidze, who have accepted their false version of these events." *Id.* ¶ 108.

[305] *Thompson v. AT&T Corp.*, 371 F. Supp. 2d 661, 684 (E.D. Pa. 2005) (holding that defendants' actions—which included "profanity directed toward the Plaintiff and the accompanying verbal abuse by supervisor," "threatening Plaintiff to 'shape up or ship out,'" "teasing the Plaintiff about his physical appearance, not providing documentation for disability insurance to the Plaintiff, providing false information to the disability insurance carrier indicating the Plaintiff did not enroll in the program when in fact he did, and . . . falling the Plaintiff 'crazy' and 'nuts'"—were "certainly rude, callous and insensitive in a work atmosphere," but did not constitute extreme and outrageous conduct as required to state an IIED claim); *see also* Restatement (Second) of Torts § 46 comment (d) illustration 4 (1965) ("A makes a telephone call but is unable to get his number. In the course of an altercation with the telephone operator, A calls her a God damned woman, a God damned liar, and says that if he were there he would break her God damned neck. B suffers severe emotional distress, broods over the incident, is unable to sleep, and is made ill. A's conduct, although insulting, is not so outrageous or extreme as to make A liable to B.").

[306] Doc. 105 ¶¶ 82, 86.

[307] *Id.* ¶¶ 83, 88.

[308] *Id.* ¶¶ 86–96.

outrageous," so "atrocious," so "utterly intolerable" as to support a claim for IIED.[309]

Therefore, the Court finds that as a matter of law, the facts alleged in the Amended Complaint fail establish that the Defendants owed her the requisite legal duty to sustain an NIED claim, and likewise do not demonstrate conduct adequately extreme and outrageous to support a claim for IIED. As such, Count VII of the Amended Complaint is dismissed with prejudice.

## IV.   CONCLUSION

We have seen this show before: a long-tenured, highly regarded Penn State athletic coach covering up alleged sexual abuse by an assistant coach. Some lessons should only need to be learned once. That said, the particularities of the present case make it meaningfully different than its tragic, shameful precedent involving Jerry Sandusky. Oldham, a private fencing instructor with no direct connection to Penn State or its fencing program, was allegedly assaulted on a commercial flight from Oregon to Chicago following a national fencing tournament. Because she failed to timely raise certain allegations, include essential facts, and demonstrate an established relationship with Penn State, Oldham has not made out a case against the University or its Title IX coordinator and fencing coaches.

---

[309] *Miller*, 724 F. App'x at 182.

An appropriate Order follows.

BY THE COURT:


*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge